ATTORNEYS FOR APPELLANT
Steven E. Ripstra
Ripstra Law Office
Jasper, Indiana

Laura Paul
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Andrew A. Kobe
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 22S00-1206-DP-00360

FILED
Apr 12 2016, 12:14 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

WILLIAM CLYDE GIBSON III,

*Appellant,*

v.

STATE OF INDIANA,

*Appellee.*

_____

Appeal from the Floyd Superior Court 1, No. 22D01-1205-MR-1145
The Honorable Susan L. Orth, Judge

_____

On Direct Appeal

_____

**April 12, 2016**

**Rush, Chief Justice.**

William Clyde Gibson III pleaded guilty to murdering Stephanie Kirk, and the trial court sentenced him to death. Gibson directly appeals his sentence to this Court, raising four issues: (1) whether there was insufficient evidence to prove two aggravators—that he murdered Kirk while committing two forms of criminal deviate conduct—beyond a reasonable doubt; (2) whether allowing the State to amend the charging information was fundamental error; (3) whether the court manifestly abused its discretion in weighing mitigators and aggravators; and (4) whether his death sentence is inappropriate in light of his character and the nature of the offense. We affirm the trial court in all respects.

**Facts and Procedural History**

William Clyde Gibson met Stephanie Kirk on March 24, 2012. The next day, he sexually assaulted, strangled, and ultimately killed her. In three written confessions and multiple police interviews, Gibson detailed the day's events and the attack in his own words: He met Kirk at a bar, got her phone number, and later called her to arrange a date the next day. When Gibson arrived at Shooter's Saloon to meet Kirk the following afternoon, he saw her behind the building and approached her. The two finished Kirk's marijuana and then left to go to another bar. He and Kirk spent the rest of the day driving around "just drinking[,] smoking pot[,] and doing pain pills,"[1] and eventually went to his house where they "had sex in the living room" and then "continued to drink[,] smoke more pot and do more pain pills." State's Ex. 3, Exs. Vol. I at 41.

Gibson then described in detail how the attack unfolded: He "took some of [Kirk's] pot and pain pills," and "she got mad and we started fighting about it." Id. The argument escalated into an attack when he "put [his] hands in front of her throat" and began strangling her. State's Ex. 2, Exs. Vol. I at 24. Upon quickly subduing Kirk, Gibson put his "whole hand in [her vagina] as far in as [he] could get it" and "played around inside of [her] with [his] hand until [he] got tired of that." State's Ex. 7, Exs. Vol. I at 103. He then described what happened next: "I got [Kirk] naked" and "pulled [her] ass up against my chest and bent [her] double" and began "bitting [sic] and chewing and pulling on" her labia "with my teeth." Id. At some point during this attack, Kirk died.

Gibson told police he "panicked, completely panicked" after the murder, State's Ex. 2, Exs. Vol. I at 29, and said, "I just went out in the van, drove around drinking. I just had to get away. But I was driving around drinking thinking—trying to figure out a place to put her," id. at 27. When Gibson returned home in the early morning, he hid Kirk's nearly naked body in his garage and dug a shallow hole in his backyard by the back deck—telling his neighbor "he was replacing a rotten deck post." Tr. 1255.

Then later, under cover of darkness, he dragged Kirk's still nearly naked body through the house, across the deck to her shallow grave. He folded her backwards and buried her. Gibson watered the grave and scattered the excess dirt under a nearby tree and around the house before concealing the grave with leaves. Kirk's body lay there undisturbed until police exhumed it a month later.

---

[1] For clarity, we omit the idiosyncratic capitalization and punctuation Gibson used throughout his written confessions.

Meanwhile, Gibson began having sexual thoughts about his next victim, his late mother's dear seventy-five-year-old friend Christine Whitis. And three weeks after murdering Kirk, Gibson attacked Whitis in the very same living room—luring her to the house under the guise of needing a friend to talk to, then attacking her when she rebuffed his sexual advances. As he did with Kirk, he stripped off Whitis's clothes, sexually assaulted her by "biting and violently plunging his fist into her vagina," strangled her to death, and manipulated her body so forcefully that he broke her back. Gibson v. State, 43 N.E.3d 231, 234 (Ind. 2015). And, finally, as with Kirk, he hid Whitis's body in his garage. Id. However, before Gibson could dispose of Whitis's body, his sisters discovered it and called the police.[2]

While in jail on the Whitis murder, Gibson approached Sergeant Steve Bush and Detective Carrie Bush with information about a missing person—Stephanie Kirk. He told them he remembered seeing "some kind of sign . . . [with] a little missing girl on it" in Shooter's Saloon before being arrested. Defendant's Ex. A, Exs. Vol. II at 268. Without prompting, he named the woman as "Stephanie." Id. at 269. Initially, he said it was "possible" he "might've went out with her" but "wouldn't say that [he] killed her." Id. at 275; see also Tr. 766. The next day, Gibson talked to police again, admitted actually spending time with Kirk, and eventually confessed to killing her. But he claimed he could not remember where he put her body.

Gibson's manipulative tactics continued throughout the Kirk investigation. Generally, Gibson would request to speak to police about the Kirk murder but would only reveal information bit by bit—withholding information until he received a perk like cigarettes or coffee or biscuits and gravy or time out of general lock-up. Sergeant Bush described Gibson as "a very controlling person, manipulative in the sense of . . . he would send us on goose chases and guide us in a direction that wasn't the truth." Tr. 762. For example, Gibson initially said he dumped Kirk's body in the Ohio River, but then he said he buried her in a wooded area off Mount Tabor Road. Police searched both areas and did not find the body. Only when police informed Gibson that he would be returning to general lock-up and would not receive coffee, did he reveal that he buried Kirk's

---

[2] Gibson admitted killing Whitis, claiming he "just snapped." Gibson, 43 N.E.3d at 234. The jury found Gibson guilty of murdering Whitis and recommended the death penalty. Id. at 235. The trial court sentenced Gibson to death, and we affirmed the sentence. Id. at 235, 242.

body in his backyard. When police exhumed Kirk's body from the yard, they found it "folded and contorted in different directions," Tr. 1223, clad only in a black leather vest and torn bra.

The State charged Gibson with murder, alleged he was a habitual offender, and sought the death penalty based on four aggravating circumstances—specifically, that during the murder, Gibson used force or threat of force to commit or attempt to commit criminal deviate conduct on Kirk (1) with his mouth and (2) with his fingers or fist; (3) that he had committed another murder (namely, of Whitis); and (4) that he was on probation (namely, for D-felony auto theft) when he murdered Kirk.

On the second day of jury selection, Gibson agreed to plead guilty to murder in exchange for the State dropping the habitual offender allegation. Gibson also waived jury trial for the penalty phase, agreeing the court alone would decide whether to sentence him to death, life imprisonment without parole, or a term of years. The State simultaneously amended, without objection, the charging information, changing Aggravator 3 from Gibson having *committed* the Whitis murder to having been *convicted* of it.

Following a four-day sentencing hearing with fourteen witnesses and forty-seven exhibits, the court issued a twenty-six page sentencing order setting out its findings, including that the State proved all four death-penalty aggravators beyond a reasonable doubt. Specifically, it determined that Gibson's acts of deviate conduct with Kirk were compelled by force or threat of force, based on Kirk's ripped bra, bruising on her arm, and Gibson's acknowledgment that he caused her pain; that Gibson had been convicted of the Whitis murder on October 25, 2013; and that Gibson was on probation when he murdered Kirk. It merged the two deviate-conduct aggravators and assigned them "moderate weight" and gave "great weight" to the remaining two aggravators.

The sentencing order then addressed Gibson's alleged mitigating circumstances, giving moderate weight to his guilty plea; minimal weight to his claims of an abusive family history, severe mental illness and/or alcoholism, and admissions that aided the investigation; and no weight to his claim of remorse. It also considered the statutory mitigators, assigning minimal weight to Gibson's "extreme mental or emotional disturbance" and impaired "capacity to appreciate the criminality of [his] conduct . . . as a result of mental disease or defect or intoxication," and finding the others unsupported or inapplicable. In the end, the court determined that death was "the only appropriate

4

sentence" for Gibson. Gibson now directly appeals his death sentence to this Court under Indiana Appellate Rule 4(A)(1)(a)—raising four issues that we address in turn, providing additional facts when necessary.

**Discussion and Decision**

### I. There Was Sufficient Evidence to Prove Aggravators 1 and 2 Beyond a Reasonable Doubt— That Gibson Murdered Kirk While Committing Criminal Deviate Conduct.

Gibson first argues there was insufficient evidence to prove beyond a reasonable doubt that he murdered Kirk while committing criminal deviate conduct. Our standard of review for sufficiency challenges does not change in capital cases. We neither reweigh evidence nor judge witness credibility. Bieghler v. State, 481 N.E.2d 78, 84 (Ind. 1985). Rather, we "consider only that evidence most favorable to the [judgment] together with all reasonable inferences . . . drawn therefrom." Id. We will affirm the judgment if it is supported by "substantial evidence of probative value . . . even [if] there is some conflict in that [evidence]." Id.

Indiana law permits the death penalty only if the State proves the existence of at least one statutory aggravating circumstance beyond a reasonable doubt. Ind. Code § 35-50-2-9(a) (2008 Repl.). Criminal deviate conduct is one such aggravator, I.C. § 35-50-2-9(b)(1)(D) (2008 Repl.), defined as compelling the victim "by force or imminent threat of force," I.C. § 35-42-3-2 (2008 Repl.), to engage in an act involving either "a sex organ of one person and the mouth or anus of another person or the penetration of the sex organ or anus of a person by an object," I.C. § 35-31.5-2-94 (Supp. 2012).

Gibson argues there is insufficient evidence to support the court's finding that he killed Kirk while committing criminal deviate conduct because the evidence—particularly his statements coupled with the uncertain forensic evidence—indicate Kirk died before the deviate conduct occurred. In other words, Gibson asks this Court to trust his word that Kirk was already dead when he sexually assaulted her and ignore substantial probative evidence to the contrary.

Gibson bases his argument upon Trowbridge v. State, where the defendant was convicted of both rape and abuse of a corpse. 717 N.E.2d 138, 148–49 (Ind. 1999). There the rape conviction was vacated because the State presented "no evidence" that the victim was alive during intercourse. Id. at 148. Gibson reads Trowbridge as establishing a bright-line rule that unless the victim of any sexual

5

assault is alive, the relevant crime is abuse of a corpse. But we decided Trowbridge on double-jeopardy grounds—that "convicting Trowbridge of both crimes appears to punish him twice for the same act," id. at 149—not on any principle that sex-crime victims must be alive. Moreover, the "criminal deviate conduct" aggravator is not a separate offense that would implicate double-jeopardy principles, but rather a measurement of the depravity of the murder. And in any event, we need not consider such a rule today because Gibson's sufficiency argument fails with or without it—because his own statements, the forensic evidence, and the physical evidence provide sufficient evidence that Kirk was alive when the deviate conduct occurred.

First, despite Gibson's current assertions about the attack's sequence, the record shows he has been equivocal at best. Only once in the record did Gibson explicitly state he killed Kirk and "*then* . . . did many sick things to her . . . with [his] hand." State's Ex. 8, Exs. Vol. I at 106 (emphasis added). Other times, Gibson gave a different account. For example, in one letter, he was silent as to the attack's sequence. There he described the deviate conduct in detail without indicating whether Kirk was dead or alive. State's Ex. 7, Exs. Vol. I at 103. He even once said "I'm not real [sic] clear on what all really happened . . . ." State's Ex. 3, Exs. Vol. I at 41. Then in other moments of clarity, he expressly affirmed to police he did *nothing* sexual to Kirk after she died. State's Exs. 2, 4, 6, Exs. Vol. I at 29, 49, 84–85, 94. He also acknowledged on the record that he caused Kirk physical pain, further implying she was alive during the deviate conduct. State's Ex. 8, Exs. Vol. I at 106. Thus, despite Gibson's contrary assertions now, his own prior statements in the record indicated Kirk was alive when he sexually assaulted her.

The forensic evidence also supports the conclusion that Gibson forcefully overpowered an alive and resistant Kirk to accomplish his vicious attack, including the deviate conduct. As the court acknowledged, some of the forensic evidence was limited—but only because, after lying in a shallow grave for nearly a month, Kirk's body decomposed enough to make it impossible to discern *if*, let alone *when*, any sexual activity (consensual or otherwise) occurred. Tr. 818–19, 825–26, 840–42, 846–847. Nevertheless, the court found that, despite decay, the autopsy did reveal evidence of ante-mortem (pre-death) force, namely three bruises on Kirk's left arm. Id. at 832. Dr. Amy Burrows-Beckham, who performed Kirk's autopsy, testified the bruising likely resulted from being "grabbed forcefully by someone else's hand." Id. at 833. Dr. Burrows-Beckham further testified she had seen that type of bruising in other sexual assault victims, who were "grabbed, maybe forcefully held" throughout an assault. Id. at 842.

Finally, physical evidence of pre-death force in the record that supported the court's judgment included Kirk's ripped bra. Pictures showed Kirk's bra remained clasped in the back but the front had been torn. Id. at 869–871; State's Ex. 20, Exs. Vol. I at 133; see also State's Exs. 23–27, Exs. Vol. I at 136–40. Sergeant Steve Bush testified his training and experience led him to conclude, in context, Kirk's ripped bra suggested a forceful, violent sexual assault and not consensual sex. Tr. 800.

Against this evidentiary backdrop, Gibson's sufficiency argument fails. There was substantial evidence (and reasonable inferences therefrom) to support the trial court's judgment that Kirk was alive during at least part of Gibson's forceful, savage attack and therefore that Gibson murdered Kirk while committing criminal deviate conduct. Consequently, we affirm the trial court's judgment that the State proved Aggravators 1 and 2 beyond a reasonable doubt.

## II. The Trial Court Did Not Commit Fundamental Error When It Allowed the State to Amend the Charging Information.

On the second day of jury selection—shortly before Gibson pleaded guilty—the State moved to amend the charging information as to Aggravator 3. Specifically, the State sought to change the allegation that Gibson *committed* the Whitis murder to that he had been *convicted* of it. Gibson did not object. Tr. 704–705. Now, on appeal, Gibson argues the trial court committed fundamental error by allowing the State to amend the death penalty information on the same day he pleaded guilty and more than two years after the initial information. We disagree.

Ordinarily the State may amend a death penalty charging information's form at any time so long as it "does not prejudice the substantial rights of the defendant." Ind. Code § 35-34-1-5(c) (2008 Repl.). "A defendant's substantial rights 'include a right to sufficient notice and an opportunity to be heard regarding the charge; and, if the amendment does not affect any particular defense or change the positions of either of the parties, it does not violate these rights.'" Erkins v. State, 13 N.E.3d 400, 405 (Ind. 2014) (quoting Gomez v. State, 907 N.E.2d 607, 611 (Ind. Ct. App. 2009), trans. denied). Since Gibson did not object and argue amending the charging information prejudiced any of these rights or affected his defense, he must now prove the amendment constituted fundamental error. "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged error[] [is] so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" Ryan v. State, 9 N.E.3d 663, 668 (Ind. 2014) (quoting Benson v.

State, 762 N.E.2d 748, 756 (Ind. 2002)). To satisfy this burden, Gibson "must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because" amending Aggravator 3 in the charging information "'constitute[d] [a] clearly blatant violation[] of basic and elementary principles of due process' and . . . 'present[ed] an undeniable and substantial potential for harm.'" Id. (quoting Benson, 762 N.E.2d at 756). Gibson does not meet this heavy burden.

From the beginning, the State based Aggravator 3 in the charging information—that Gibson committed another murder—on the Christine Whitis murder. Because Gibson had not yet gone to trial in the Whitis case, the State originally phrased Aggravator 3 pursuant to Indiana Code section 35-50-2-9(b)(8): "The defendant has *committed* another murder, at any time, regardless of whether the defendant has been convicted of that other murder." (Emphasis added). Gibson moved to dismiss the aggravator because he was not being tried for the Kirk and Whitis murders in the same pro-ceeding, but the court held the motion in abeyance. After Gibson was convicted in the Whitis case, the State moved to amend the charging information pursuant to Indiana Code section 35-34-1-5, changing the basis for Aggravator 3 to Indiana Code section 35-50-2-9(b)(7)—that Gibson "has *been convicted of* another murder." I.C. § 35-50-2-9(b)(7) (emphasis added).[3]

Before considering the State's proposed amendment, the trial court referenced Gibson's prior motion to dismiss and asked if Gibson now objected to Aggravator 3 in light of the Whitis conviction. Gibson's counsel responded, "No." Tr. 704. The court next asked if Gibson required more time to consider or object to the amendment and counsel responded: "No, Your Honor. We've discussed that thoroughly with our client and he understands." Id. at 705. The court then addressed Gibson personally, asking him if he understood the amendment, and he responded, "Yes." Id. The court then granted the State's motion, allowing the amendment. Id.; App. 506.

Now Gibson claims amending Aggravator 3 was fundamental error because it amounted to a blatant due process violation, presented substantial potential for harm, and subjected him to grave peril. But from the initial charging date in 2012, Gibson knew the Whitis murder served as the *only* basis for Aggravator 3 and he could defend against it *only* by showing he did not kill Whitis. Thus,

---

[3] Gibson also argues the State's unexplained ten-month delay between the Whitis conviction and moving to amend the information made the amendment untimely but makes no argument why the untimeliness constitutes fundamental error. We need not address Gibson's timeliness argument, though, because Indiana Code section 35-34-1-5(c) allows the State to amend the information "any time before, during, or after the trial" so long as the amendment "does not prejudice the substantial rights of the defendant."

amending Aggravator 3 neither presented substantial harm to Gibson nor placed him in grave peril. Similarly, amending the charging information did not amount to a blatant due process violation because Gibson had sufficient notice of the original aggravator and the proposed amendment, had an opportunity to object (but didn't), and then had an opportunity to defend against it. Because Gibson cannot establish error, let alone fundamental error, we affirm the trial court's grant of the State's motion to amend this aggravator.

### III. The Trial Court Did Not Abuse Its Discretion in Weighing the Aggravating and Mitigating Circumstances in Sentencing Gibson to Death.

Gibson next argues the trial court abused its discretion when weighing aggravators and mitigators, essentially asking us to reweigh them, which we cannot do—even in a capital case. Weighing aggravators and mitigators in capital cases falls within the trial court's discretion and will be reversed only for manifest abuse of discretion. Covington v. State, 842 N.E.2d 345, 348 (Ind. 2006). The court "is under no obligation to assign the same weight to a mitigating [or aggravating] circumstance as the defendant" does. Id. This Court affords "great deference" to the trial court's weight determinations and allocations, Conley v. State, 972 N.E.2d 864, 873 (Ind. 2012) (quoting Krempetz v. State, 872 N.E.2d 605, 614 (Ind. 2007)), and will find a manifest abuse of discretion only when the "total sentence [imposed] is clearly, plainly, and obviously unreasonable," Thacker v. State, 709 N.E.2d 3, 10 (Ind. 1999) (internal quotation marks omitted).

Here, the court issued a twenty-six-page sentencing order addressing every single aggravator and mitigator raised by the parties, as well as the statutory mitigators. It carefully allocated weight to each circumstance according to the evidence of record before balancing the aggravators and mitigators and rendering the death sentence. Consequently, we cannot say the court's weight determinations made the total sentence obviously unreasonable.

*A. The trial court did not abuse its discretion in giving great weight to Aggravator 4, Gibson's probationary status.*

Gibson insists the trial court should not have considered, let alone given "great weight" to, Aggravator 4 (that he was on probation when he murdered Kirk)—arguing that his probationary status for D-felony auto theft was so trivial compared to murder, making his sentence grossly disproportionate and thereby violating the Eighth Amendment and Article 1, Section 16. Probationary status is a valid, constitutional aggravating circumstance for the death penalty in Indiana. I.C. § 35-

9

50-2-9(b)(9)(C). Still, Gibson argues that under <u>Knapp v. State</u>, probationary status can be trivial enough to render a death sentence unconstitutionally disproportionate if the past felony bears no relationship to the present murder. 9 N.E.3d at 1289–90. That argument overstates <u>Knapp</u>'s holding.

In <u>Knapp</u>, we assessed the proportionality of the probationary status aggravator by considering "the nature and gravity of [murder] along with the nature of the prior felonies underlying [the defendant's] probation." <u>Id.</u> at 1290. We recognized that "the nature and gravity of any intentional murder is the gravest offense known to Indiana law and involves the ultimate harm to its victim"—expressly distinguishing crimes "involving little or no harm to person or property," for which we occasionally found probation-based sentence enhancements to be disproportionate. <u>Id.</u> (discussing <u>Best v. State</u>, 566 N.E.2d 1027 (Ind. 1991) and <u>Clark v. State</u>, 561 N.E.2d 759 (Ind. 1990)). Moreover, we specifically stated that "the very *fact* of probation is relevant" in murder cases, "regardless of the offense on which it is based"—because "[c]ommitting a murder while on probation for any felony offense, even a low-level felony, is . . . a particularly flagrant abuse of [the] grace and leniency" probation represents. <u>Id.</u> <u>Knapp</u> stated that probation-based enhancements are proportionate "*especially* when . . . there is a distinct nexus between the prior offenses and the present murder," as there was in that case. <u>Id.</u> at 1291 (emphasis added). But we did not necessarily *require* such a nexus, either.

Moreover, contrary to Gibson's arguments, theft is a distinct nexus between his probationary offense and this murder. In <u>Knapp</u>, the defendant became "raged and crazed" on methamphetamine before committing murder while he was on probation for two D-felony methamphetamine offenses, so that methamphetamine was a distinct nexus between the prior and present crimes. <u>Id.</u> at 1290–91. Similarly here, Gibson's probation was for D-felony auto theft, and his attack on Kirk began when she confronted him for his admitted theft of her prescription pain pills. State's Exs. 2–3, Exs. Vol. I at 23, 41. Just as in <u>Knapp</u>, this death sentence is not grossly disproportionate.

Finally, we note that this murder was the final act in a long string of Gibson's probation violations. The record showed that on March 11, 2005, Gibson was sentenced to three years of probation for D-felony auto theft. And less than one month into probation, on April 7, 2005, he violated probation. Then, over the next three years, Gibson amassed more probation violations and theft convictions—even serving time in prison. Indeed, those transgressions are why Gibson was still on probation for the 2005 auto theft felony in 2012, and the court took pains to note that in the

sentencing order. Even more clearly here than in Knapp, the trial court did not manifestly abuse its discretion by affording Gibson's probationary status great weight.

B. *The trial court properly evaluated Gibson's proposed mitigators and did not abuse its discretion by affording them moderate, little, or no weight.*

Gibson also argues the court abused its discretion by affording too little weight to his proposed mitigators—family history, alcoholism, severe mental illness, guilty plea, cooperation with law enforcement, and remorse. He essentially asks us to reweigh the mitigators and issue a lesser sentence. The record, however, shows the trial court fully considered Gibson's six proposed mitigators, and its assessment of their weight was well within its discretion.

Gibson maintains the first three mitigators, primarily that he grew up in an abusive home and consequently suffers from alcoholism and severe mental illness, deserved more than minimal weight. While the record is replete with testimony from family, friends, and doctors regarding Gibson's mental health, alcoholism, and family history, that evidence does not compel us to accept Gibson's self-portrayal as an abused, misunderstood, pitiable addict.

First, Gibson points to substance abuse expert Barry Hargan, who classified Gibson as a Type 2 alcoholic who could not escape the disease he inherited. Hargan explained Type 2 Alcoholism is passed genetically from father to son and characterized by aggressive, impulsive personalities. He also noted Gibson's mental illness and opined bipolar disorder and Type 2 Alcoholism can combine to "destroy" patients like Gibson. Tr. 1007. Ultimately, though, Hargan could not say whether Gibson's drinking or mental illness made him commit these awful crimes. Id. at 1074–84. Likewise, Dr. Heather Henderson-Galligan, Ph.D., HSSP, testified Gibson had "serious mental issues," Id. at 1147–48, 1191, but she too opined mental illness did not "solely" lead to Gibson's crimes, Id. at 1183, and should not excuse his behavior, Id. at 1197.

Other evidence in the record is also conflicting. For example, Gibson's sister testified that even though their father drank and could be strict or even verbally abusive, she, Gibson, and their siblings enjoyed a "pretty normal" childhood. Id. at 900, 903. Gibson's sister stated their father's verbal abuse was confined to dinnertime and would sometimes "ruin" meals, but that was all. Id. at 917. Similarly, she detailed Gibson's drinking and mental illness, but also described how he routinely rebuffed family interventions and professional treatment. Id. at 894–95, 897–98, 904–909. Gibson's

longtime friend, Scott Flora, likewise testified that Gibson would "just . . . giggle and laugh" when told he needed to stop "drinking and drugging." Id. at 959. Flora opined he never believed Gibson would ever stop drinking. Id. Gibson's medical records tell a similar story—a troubled man who refused treatment even when "mentally clear and functioning as a competent adult." States Ex. 35, Exs. Vol. I at 201–02; see also State's Exs. 32–35, Exs. Vol. I at 150–251.

Gibson also argues that his guilty plea, cooperation, and remorse merit more than moderate, little, and no weight, respectively. Concerning the guilty plea, Gibson claims he provided considerable benefits to the State while he received little to nothing in return. But he did get something in exchange—the State dropped the habitual offender charge, substantially reducing the term of years he would face if the trial court rejected the death penalty or life without parole. Moreover, despite facing a strong case, he waited to plead guilty until the second day of jury selection—more than two years after being charged. Concerning Gibson's cooperation with law enforcement, he claims that without him, Kirk's disappearance would still be unsolved. That might well be true. But it does not diminish that he changed his story several times and manipulated the police for favors. Finally, concerning remorse, Gibson claims the State relied too heavily on his large "Death Row X 3" tattoo (described below) in giving his remorse no weight. But credibility, including credibility of professed remorse, is a discretionary judgment for the trial court—and finding the tattoo as indicating pride and defiance inconsistent with remorse was well within the court's discretion.

As we noted above, Gibson essentially asks us to reweigh the mitigators, which we will not do. Since the trial court addressed each mitigator and explained its weight allocations, we give its determinations great deference and affirm.

## IV. Gibson's Death Sentence Is Not Inappropriate in Light of the Nature of This Offense and What the Record Reveals About His Character.

Finally, Gibson argues his death sentence is inappropriate in light of the nature of the offense and his character. He asks this Court to exercise its Article 7, Section 4 and Appellate Rule 7(B) power to review his sentence. We may revise a sentence authorized by statute, if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender. Ind. Appellate Rule 7(B). The principal role of our review is to leaven outliers rather than achieving a "perceived 'correct' sentence." Knapp, 9 N.E.3d at 1292 (quoting Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008)). Ultimately, Gibson bears

the burden of persuading us that his sentence is inappropriate. <u>Reid v. State</u>, 876 N.E.2d 1114, 1116 (Ind. 2007) (citing <u>Childress v. State</u>, 848 N.E.2d 1073, 1080 (Ind. 2006)). Because he fails to meet this burden, we decline to revise his sentence.

The record illustrates the gruesome and grotesque nature of Gibson's offense. He murdered a defenseless woman in a brutal attack. Upon overpowering and strangling Kirk, he bit and chewed her labia and inserted his whole fist in her vagina, breaking her back in the process. Afterwards, he left her nearly naked body lying in his home while he went out drinking. When he finally decided to dispose of her, he contorted Kirk's still naked body and buried her in a shallow grave in his backyard. We acknowledge that even though this killing is beyond horrendous, Gibson's character does present a few redeeming qualities. The record shows he is a man who earned a college degree; possesses artistic and woodworking talents; and cared for his ailing, elderly mother in her final days. Nevertheless, we cannot overlook his long criminal history, his aversion to alcohol or mental health treatment, or his lack of remorse as documented in the record. Gibson's criminal history spans more than twenty years and includes convictions for murder, assault, robbery, sexual abuse, operating a vehicle while intoxicated, resisting law enforcement, reckless driving, receiving stolen auto parts, conversion, and auto theft. Inconsistent with genuine remorse for any of his past and present crimes, Gibson wears his most heinous crimes as a badge of honor. While on death row, before being tried for Kirk's murder, Gibson surreptitiously had "Death Row X 3"[4] tattooed in six-by-eight-inch letters on the back of his shaved head. Tr. 1341. Committing such a horrifying crime—and then, while awaiting trial, getting a tattoo to glorify it—does not speak well about Gibson's character. Accordingly, he has not persuaded us that the nature of his offense and his character as an offender warrant revision of his sentence.

## Conclusion

William Clyde Gibson III murdered Stephanie Kirk and the trial court sentenced him to death. After careful review, we find the court did not err and that the sentence is not inappropriate. We therefore affirm.

Dickson, Rucker, David, and Massa, JJ., concur.

---

[4] After being convicted of the Whitis murder, Gibson pleaded guilty to the 2002 murder of Karen Hodella under Cause Number 22D01-1205-MR-1144. In that case, though, he was sentenced to 65 years—not death.