## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jan 30 2019, 9:34 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
BALL EGGLESTON, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jakob Duncan,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

January 30, 2019

Court of Appeals Case No.
18A-CR-1568

Appeal from the White Superior Court

The Honorable Robert B. Mrzlack, Judge

Trial Court Cause No.
91D01-1708-F1-141

**Bailey, Judge.**

# Case Summary

[1] Following a jury trial, Jakob Duncan ("Duncan") was found guilty of two counts of Child Molesting, as Level 1 and Level 4 felonies.[1] Duncan presents two issues on appeal, which we restate as (1) whether statements the victim made to her mother were improperly admitted under the "excited utterance" exception to the rule against hearsay; and (2) whether the State presented sufficient evidence to support the Level 1 felony conviction. We affirm.

# Facts and Procedural History

[2] In August 2017, the State charged Duncan with two counts of Child Molesting, as Level 1 and Level 4 felonies. A jury trial commenced in April 2018. At trial, the State's first witness was A.D., who had been married to Duncan at the time of the alleged criminal conduct. A.D. testified that, on April 10, 2017, Duncan was upstairs taking a nap before his afternoon shift. Their infant son was in a crib in another bedroom. A.D. was downstairs watching television with M.B., her four-year-old daughter from a prior marriage. A.D. fell asleep.

[3] Around 3:00 p.m., Duncan said goodbye to the family when he left for work. A.D. testified that, at that point, everything seemed fine. Later that day, M.B. came up to A.D. in the kitchen. The State asked A.D. if anything seemed "unusual about [M.B.'s] behavior when she came to talk," and A.D. testified

---

[1] Ind. Code § 35-42-4-3(a), -3(b).

that M.B. "wanted to tell me something, but she seemed scared to tell me." Tr. Vol. II at 22. The State then asked what M.B. had said, at which point Duncan lodged a hearsay objection. The State argued that M.B.'s statement to A.D. was an excited utterance that fell under an exception to the rule against hearsay. The State also argued that M.B.'s statement "precipitates certain actions by the mother which should be explained with regard to the disclosure of the events leading to these charges." *Id.* at 23. The trial court took the objection under advisement and directed the State to elicit testimony regarding the "[t]imeframe involved here" between Duncan leaving for work and M.B. coming up to A.D in the kitchen. *Id.* at 24. A.D. testified that a "few hours" had passed since Duncan had left for work, "probably four or five hours." *Id.*

[4]     Duncan renewed his hearsay objection, which the trial court overruled. A.D. then testified as follows:

> [M.B.] came up to me when I was in the kitchen and said that she had seen [Duncan's] butt and her words "butt", she's four, we called everything "butt". Lifted up her finger and said, "I saw [Duncan's] butt." And then she said that he had kissed her butt and her leg got wet. And . . . [s]he said that [Duncan] had said not to tell mom. That's why she was scared to tell me.

*Id.* at 25. A.D. asked M.B. whether Duncan had kissed her "front butt" or "back butt." *Id.* M.B. replied that Duncan had kissed her "front butt." *Id.*

[5]     While Duncan was at work, A.D. told Duncan via text message that M.B. had told her a story. A.D. asked whether M.B. had visited while Duncan was napping. Duncan replied that M.B. had gone into the room and tried to wake

him up. He stated that he "didn't mean to yell at her but she was being annoying." Ex. 1. A.D. responded: "That's not it." *Id.* In a later text message, Duncan asked if he was in trouble, and A.D. responded that he was. Duncan then pleaded with A.D. to call him. He later sent the following text message: "Sorry I'm a stupid person…i deserve what I get…sorry I need to see a dr. Or ju at kill myself." *Id.* (errors in original). Duncan followed up with another text message: "Tell me should I kill myself or try to work through thus [*sic*] let me know asap I'm on a bridge right now waiting for your answer." *Id.* A.D. told Duncan not to do anything stupid and to talk with her in person.

[6] Meanwhile, A.D. had called family, arranging a meeting with A.D., A.D.'s father, Duncan, and Duncan's father. When Duncan returned from work, the four of them met. A.D. testified that she told Duncan what M.B. had said, and Duncan initially said nothing. Duncan then started crying. Duncan admitted that he knew something happened between him and M.B. but that "he blacks out and he has a problem, he doesn't know what to do about it." Tr. Vol. II at 30. The meeting ended with an agreement: A.D. promised not to call the police if Duncan would stay out of the lives of A.D. and the children. Duncan left.

[7] The next day, A.D. and Duncan met at the courthouse and began the process of dissolving their marriage. In the ensuing weeks, A.D. noticed that M.B. began "acting out," asking other children to take off their pants. *Id.* at 49. A.D. later reported M.B.'s allegations to the police, which led to the instant charges.

[8] M.B. testified at trial, at which point she was five years old. Her testimony was that M.B. went into Duncan's and A.D.'s bedroom, where Duncan was awake on the bed. M.B. testified that she was alone with Duncan, who called her over. Duncan pulled his underwear down. M.B. then held Duncan's "pee-pee," which "had a hole in the middle." *Id.* at 90. Duncan pulled off M.B.'s underwear and touched M.B. "on [her] pee-pee" with his tongue. *Id.* at 91. Duncan licked the "inside" of M.B.'s "pee-pee" and said it "taste[d] bad." *Id.* M.B.'s "leg got wet, and he told [her] to get out." *Id.* M.B. then "went downstairs, [Duncan] went to work, and [M.B.] told [A.D.]." *Id.* at 91.

[9] Duncan also testified at trial. Duncan testified that he told M.B. "three separate times to leave me alone I'm trying to take a nap, and she came in, and on the third time I spanked her, and that was it. And she left the room." *Id.* at 127. According to Duncan, he spanked M.B. while her clothes were on, and he did not engage in inappropriate touching. Duncan testified that he went to the bridge because he "didn't want to go to jail for spanking [M.B.]" and did not want to lose his family. *Id.* at 135. Duncan also testified that the family meeting was not about sexual allegations but about him disciplining M.B. Duncan further testified that he had not said anything about blacking out.

[10] Other witnesses included A.D.'s father and Duncan's father, who each testified about the family meeting. According to A.D.'s father, A.D. told Duncan "exactly what had happened with M.B.," and Duncan apologized and said "right off the bat . . . 'I know I did it,' and then later on he said that 'I do these things, and then I black out. I black out.'" *Id.* at 74. A.D.'s father testified that

he understood the allegations to be a sexual touching. As to Duncan's father, he testified that he initially thought the meeting was about spanking, but that the meeting involved sexual allegations. He also testified that Duncan did not admit to touching M.B. in a sexual way, and he did not hear Duncan apologize or hear Duncan mention the possibility of doing something but blacking out.

[11] The jury found Duncan guilty of both counts. At sentencing, the trial court merged the Level 4 felony count into the Level 1 felony count, and sentenced Duncan to thirty-six years in the Indiana Department of Correction.

[12] Duncan now appeals.

# Discussion and Decision

## Excited Utterance

[13] Duncan challenges the admission of statements M.B. made to A.D., which the State offered as proof that Duncan molested M.B. Those statements were hearsay. *See* Ind. Evidence Rule 801(c) (defining hearsay as "a statement that: (1) is not made by the declarant while testifying at the trial or hearing; and (2) is offered in evidence to prove the truth of the matter asserted"). Hearsay is inadmissible unless the evidence rules "or other law provides otherwise." Ind. Evid. R. 802. Here, the trial court admitted the statements under the "excited utterance" exception for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Evid. R. 803(2). "For a hearsay statement to be admitted as an excited

utterance, three elements must be shown: (1) a startling event, (2) a statement made by a declarant while under the stress of excitement caused by the event, and (3) that the statement relates to the event." *Davenport v. State*, 749 N.E.2d 1144, 1148 (Ind. 2001). "[W]hether a statement constitutes an excited utterance is essentially a factual determination subject to a clearly erroneous standard of review, sometimes described as the functionally equivalent standard of abuse of discretion." *Fowler v. State*, 829 N.E.2d 459, 463 (Ind. 2005).

[14] Assuming *arguendo* that there was an insufficient foundation to admit the statements as excited utterances, "[n]o error or defect in any ruling . . . by the trial court . . . is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." Ind. Appellate Rule 66(A); *see Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014) ("The erroneous admission of hearsay testimony does not require reversal unless it prejudices the defendant's substantial rights."). "To determine whether an evidentiary error was prejudicial, we assess the probable impact the evidence had upon the jury in light of all of the other evidence that was properly presented." *Blount*, 22 N.E.3d at 564. The error is harmless "[i]f we are satisfied the conviction is supported by independent evidence of guilt such that there is little likelihood the challenged evidence contributed to the verdict." *Id.* "Put another way, 'we judge whether the jury's verdict was substantially swayed. If the error had substantial influence, or if one is left in grave doubt, the conviction cannot stand.'" *Williams v. State*, 43 N.E.3d 578, 583 (Ind. 2015) (quoting *Lafayette v.*

*State*, 917 N.E.2d 660, 666 (Ind. 2009)).  Moreover, "[a]dmission of hearsay evidence is not grounds for reversal where it is merely cumulative of other evidence admitted."  *McClain v. State*, 675 N.E.2d 329, 331-32 (Ind. 1996).

[15]   At trial, M.B. testified regarding the acts of molestation.  The statements M.B. made to A.D. were cumulative of M.B.'s trial testimony.  Thus, we conclude that any error in the admission of the hearsay evidence was harmless.  *See Davenport*, 749 N.E.2d at 1149 (concluding that any error in admitting a statement as an excited utterance was harmless where the statement was "cumulative of [the declarant's trial] testimony and the 911 tape"); *McClain*, 675 N.E.2d at 332 (determining that a victim's statements to her therapist regarding acts of molestation "merely repeated the declarant's statements made on the stand," and that "any error . . . was harmless and reversal is not required.").

## Sufficiency of the Evidence

[16]   In reviewing a challenge to the sufficiency of evidence, "[w]e neither reweigh evidence nor judge witness credibility."  *Gibson v. State*, 51 N.E.3d 204, 210 (Ind. 2016).  "[W]e look only at the probative evidence and reasonable inferences supporting the verdict," and "will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt."  *Love v. State*, 73 N.E.3d 693, 696 (Ind. 2017).

[17]   Here, Duncan challenges the sufficiency of the evidence supporting his conviction of Child Molesting, as a Level 1 felony.  To convict Duncan of this offense, the State was obligated to prove that Duncan—who was at least

twenty-one years old—"knowingly or intentionally perform[ed] or submit[ted] to . . . other sexual conduct (as defined in IC 35-31.5-2-221.5)" with M.B., who was less than fourteen years old. I.C. § 35-42-4-3(a). The cited definition of "other sexual conduct" includes "an act involving . . . a sex organ of one (1) person and the mouth or anus of another person." I.C. § 35-31.5-2-221.5.

[18] Duncan challenges the sufficiency of evidence that he licked M.B.'s sex organ. Duncan argues that five-year-old M.B.'s use of the term "pee-pee" was too vague, and that "pee-pee" could have been "a general term for 'everything' in the waist / groin / buttocks area." Br. of Appellant at 13. However, a conviction for child molesting may rest solely upon the uncorroborated testimony of the victim, "despite the child's limited sexual vocabulary or unfamiliarity with anatomical terms." *Stewart v. State*, 768 N.E.2d 433, 436 (Ind. 2002). Indeed, the question is "whether there was sufficient evidence before the jury so that it could reach the conclusion that [the child's terminology] . . . referr[ed] to a sexual organ." *Id.* Here, M.B. testified that Duncan pulled down his underwear, and M.B. saw Duncan's "pee-pee." Tr. Vol. II at 90. M.B. testified that she held Duncan's "pee-pee," which "had a hole in the middle." *Id.* M.B. further testified that Duncan removed her underwear before Duncan licked the inside of her "pee-pee." *Id.* at 91-92. This is sufficient evidence from which a jury could reasonably infer that the term "pee-pee" referred to Duncan's penis and M.B.'s vagina. *Compare Heeter v. State*, 661 N.E.2d 612, 616 (Ind. Ct. App. 1996) (identifying sufficient evidence of involvement of a sex organ where the victim testified that the defendant

"moved her panties and kissed her 'private part,'" which was "the area 'between your legs'") *with Shackelford v. State*, 622 N.E.2d 1340, 1344 (Ind. Ct. App. 1993) (identifying insufficient evidence of involvement of a sex organ where the victim testified that the defendant kissed one of her "private parts," a term the victim used to refer to her breast area, groin area, and buttock area).

[19] Affirmed.

Bradford, J., and Brown, J., concur.