## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 17 2019, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ann M. Sutton
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jagger M. Williams,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 17, 2019

Court of Appeals Case No.
18A-CR-2220

Appeal from the Marion Superior
Court

The Honorable Mark Stoner,
Judge

Trial Court Cause No.
49G06-1705-MR-17805

**Tavitas, Judge.**

## Case Summary

[1] Jagger M. Williams appeals his conviction for murder. We affirm.

## Issue

Williams raises one issue on appeal, which we restate as whether the evidence is sufficient to convict Williams of murder, instead of the lesser offense of voluntary manslaughter.

## Facts

In 2017, Williams was involved in a relationship with both Christen Brown, and Charmella Upchurch; both women knew about the other woman.[1] Upchurch indicated that the relationship between Brown and Williams was contentious and that they argued regularly. Upchurch recalled an occasion in April 2017 when Brown and Williams fought at Upchurch's and Williams' home. As Brown was leaving, Williams called after her, "I told you don't come over here no more you stupid b****," and then shot at Brown's car as she drove away with her children in the car. Tr. Vol. II p. 69. As Williams shot at Brown's car, he said, "I'll kill you[,] you stupid b****."[2] *Id.*

On May 10, 2017, Upchurch and Williams went to a junkyard to get parts for Upchurch's and Williams' car. While at the junkyard, Brown repeatedly called Upchurch and Williams, and Williams became annoyed with Brown's constant calls. After Upchurch and Williams left the junkyard and returned home,

---

[1] Williams' relationship with Upchurch began approximately two years prior to the May 2017 incident, whereas Williams' and Brown's relationship began approximately four months prior to the May 2017 incident.

[2] Williams, testifying in his defense, also recalled this incident and stated that he shot at Brown's vehicle because she was threatening him.

Brown came to Upchurch's and Williams' home. Williams spoke with Brown and allowed Brown inside. Subsequently, Upchurch, Williams, and Brown planned to go to a casino. On the way to the casino, the group stopped at a liquor store and a hotel so that Brown could inquire about the cost of a hotel room. Williams was drinking in the car, and Brown had one to two drinks at the casino.

After twenty to thirty minutes and a $500.00 loss at the casino, the group went to the gas station and McDonald's restaurant across the street. While ordering food, Williams and Brown got into an argument about money. The argument was so disruptive that other patrons began to notice. Upchurch stated that the argument centered around Brown's interest in using the website, "Backpage," to rob people that evening, which was the reason the group checked the price of a hotel room earlier in the evening. *Id.* at 93. Brown wanted to commit the robberies to generate rent money. According to Upchurch, Williams did not refuse to commit the robberies, but he was hesitant because the last time Brown and Williams committed a similar robbery, the victim "got a little bit rough" with Brown.[3] *Id.* at 93.

As the group left McDonald's, Williams and Brown continued to argue; Brown got upset and went back inside the restaurant. Williams stayed in the car, and Upchurch went inside the restaurant to talk with Brown. Upchurch told Brown

---

[3] Later, Upchurch indicated that the argument centered around Brown cutting Williams' phone off.

that Brown "can't win an argument [with Williams], so [Brown should] just leave it alone. Don't argue." *Id.* at 76.

[7]     Brown and Upchurch returned to the vehicle, and the group proceeded to Brown's home so Upchurch and Williams could use the shower. While in the vehicle, it appeared to Upchurch that Brown and Williams reconciled because they were being affectionate in the backseat. At the home, Upchurch went inside to take a shower, and Brown and Williams went to a nearby gas station "to get a cigar to smoke weed." *Id.* at 78. As Upchurch was getting dressed in Brown's bedroom, Williams and Brown returned from the gas station and began to argue again. After Upchurch finished her shower and changed clothes, Williams also took a shower. At this point, Upchurch told Williams that she was going to leave, but Williams would not allow her to leave. Williams told Upchurch, "[Y]ou're not going to leave no mother f****** where. If you leave, there's going to be a f****** problem." *Id.* at 80. Upchurch indicated this was not an unusual response by Williams because Williams "always talked to [Upchurch] like that." *Id.* at 81. Upchurch went back into Brown's bedroom and sat on the bed.

[8]     While Williams was in the shower, Brown complained to Upchurch about Williams' behavior. When Williams came out of the shower and heard Brown talking to Upchurch about him, Williams became angry, and he and Brown argued once again. Eventually, Williams told Upchurch that Williams and Upchurch could leave. Williams grabbed his gun, which was on the dresser, and put it in his pocket.

[9] While leaving the home, Upchurch walked past Brown, who was sitting on the stairs. As Upchurch walked out of the back door to the home, she again heard Brown and Williams arguing. When Upchurch reached her car, Upchurch turned to see Williams standing on the lower portion of the steps with Brown following behind. Brown had something in her hand that "looked like the broom" and Brown hit Williams on the back of the head with the broom while calling Williams a "stupid b****." *Id.* at 85. Upchurch saw gunfire, as Williams shot Brown in the back. Williams exclaimed: "Call the police. I just shot her." *Id.*

[10] While Upchurch was trying to call the police and determine Brown's address, Williams told Upchurch to hang up the phone and take Brown to the hospital. Williams put Brown in the car. Brown was "moaning" and bleeding from the neck. *Id.* at 86. Williams instructed Upchurch, "[w]hen you get [to the hospital,] tell them an intruder shot her." *Id.* at 87. Upchurch "ran every light" to get to the hospital and arrived shortly thereafter. *Id.* Williams continued to call and text Upchurch asking for an update on Brown's condition; Upchurch told Williams that Brown died.[4]

[11] Upchurch subsequently tried to identify Williams for detectives using Williams' Facebook account; however, Williams deleted his Facebook account before she

---

[4] The most significant of Brown's injuries was the bullet's entry into her carotid artery. Brown ultimately died of a "perforated gunshot wound of the neck and trunk of the body. The manner of death being homicide." Tr. Vol. II p. 114.

could do so. Officer Leonard Nelson with the Indianapolis Metropolitan Police Department ("IMPD") interviewed Upchurch and obtained additional information regarding Williams in order for officers to locate Williams. Officers were ultimately able to locate Williams at a Motel 8.

[12] At the Motel 8, officers recovered Williams' cell phone. IMPD Detective Grant Melton reviewed the contents of Williams' phone. During the investigation, Detective Melton discovered that Brown was deleted as a contact in Williams' phone after May 10, 2017, at 9:32 p.m. Williams had previously contacted Brown using his phone and sent Brown a text message on April 19, 2017, which stated, "Ima shoot yo s*** up I got bullets." *Id.* at 138. Williams' phone also contained messages from the early morning hours of May 11, 2017, asking friends if they could loan Williams a car or could purchase a bus ticket for him. That same morning, Williams also visited an Indianapolis news website and searched "woman shot and killed on the east side." *Id.* at 133.

[13] Williams was charged with murder on May 15, 2017. Williams waived his right to a jury trial, and a bench trial occurred on August 6, 2018. Witnesses testified to the foregoing facts. Williams testified in his own defense and stated that: (1) he shot toward the house because Brown was throwing things at Williams, and Williams "shot to scare [Brown];" (2) he was able to get the room at the Motel 8 in another person's name after he left Brown's home; and (3) he did not recall much more after that because he was "kind of intoxicated." *Id.* at 147, 154.

In closing arguments, Williams' attorney asked the trial court to find Williams not guilty of murder and, instead, guilty of reckless homicide or voluntary manslaughter based on the theory that the shooting occurred in sudden heat. In reaching its conclusion, the trial court stated:

> Now the question is [--] is it murder or is it sudden heat. The Defense has also argued for sudden heat. Sudden heat, according to the case law and a direct quote that all the lawyers are familiar with, "Sudden heat requires sufficient provocation to engender passion. Sufficient provocation is demonstrated by anger, rage, sudden resentment, or terror that is sufficient to obscure the reason of an ordinary person." Emphas[is] on ordinary person. To prevent deliberation and premeditation, the Defendant incapable of cool refection. The classic stereotype for sudden heat is a man who has no idea or, doesn't have to be sex specific, I guess, it's just a stereotype. It's a spouse that finds -- has no idea that their spouse is cheating on them ad [sic] comes home and finds the spouse in bed with another person. That's kind of your typical I am so angry, so surprised so -- that I don't have time to think about it at all and I just kill. That is your stereo typical [sic] sudden heat. There are plenty of other circumstances that can be sudden heat. But that's the kind of example we get. Because we are talking about if something would make somebody really mad and it's something that you would do totally out of control and something that you had intended to do it, but if you had thought about it or had a little time to reflect on it at all, you'd never have done it. And as I listened to the testimony I [] considered that.
>
> * * * * *
>
> But the bottom-line is being that the definition of sudden heat talks about the reason of an ordinary person. And an ordinary person isn't one that is this manipulative and this controlling in

relationships. And an ordinary person isn't one that sends out text messages saying I'm going to kill you and I've got bullets for you. An ordinary person is the one within my description that doesn't expect to find their spouse in bed with someone else and then is so uncontrollably angry that we could look at that and say, yeah, if I was in that person's shoes, it would have been dumb but I might of [sic] done the same thing. That's not what we have here. This is not ordinary conduct. This is not one talking about cool reflection and deliberation. It is an individual that is used to [being] controlling. And almost within the immediate time of having shot the victim was already cooling [sic] reflecting as to how they were going [to] deal with the situation. It's somebody else's responsibility to take them to the hospital. It's somebody else's responsibility to learn how it happened. Because you tell the person that it's going to be an intruder. An ordinary person would have sat there and did what the Defendant tried to say, which was how sorry he was and how badly he needed to go to the hospital to try and help her and how badly he needed to explain to the police how this happened and how it was a terrible terrible mistake. Instead the evidence very much shows the Defendant's manipulation of the circumstances, what his concerns were in terms of his consciousness of guilt.

Tr. Vol. II pp. 168-170. The trial court found Williams guilty of murder. Williams now appeals.

## Analysis

[15] Williams argues that the evidence was insufficient to convict him of murder because there was evidence of sudden heat, and accordingly, Williams should

have been found guilty of voluntary manslaughter.[5] Specifically, Williams contends that, instead of finding that Williams knowingly or intentionally killed Brown, which is a requirement for a murder conviction, the trial court should have found that Williams killed Brown under sudden heat.

[16] When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*), *cert. denied*. Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*.* "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of

---

[5] In portions of Williams' brief, he appears to be arguing that the murder was not performed "knowingly," but "recklessly." Appellant's Br. p. 13. While Williams did argue reckless homicide at the trial court level, he does not restate this argument for appeal, except for the brief mention that "[c]onduct is [performed] 'knowingly' if, when engaged in the conduct, the actor is aware of a high probability that he is doing so, as opposed to 'recklessly' where the conduct is done with plain, conscious, and unjustifiable disregard of harm . . .," and that Williams' actions were "born[e] out of heat, and perhaps reckless disregard for the harm that might result." *Id.* at 13, 14. To the extent that Williams attempts to reargue that he should have been convicted of reckless homicide instead of murder, his argument is waived for failure to make a cogent argument.

the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[17]   In determining whether the evidence is sufficient, we must consider the elements of murder and voluntary manslaughter. A person commits murder, as defined by Indiana Code Section 35-42-1-1, when the person, "[k]nowingly or intentionally kills another human being. . . ." A person commits voluntary manslaughter, as defined by Indiana Code Section 35-42-1-3, when the person "knowingly or intentionally . . . kills another human being . . . while acting under sudden heat." "The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder . . . to voluntary manslaughter." Ind. Code § 35-42-1-3(b).

[18]   We have held:

> [a]lthough [v]oluntary [m]anslaughter is a lesser-included offense of [m]urder, it is an atypical example of a lesser-included offense. In the case of [v]oluntary [m]anslaughter, sudden heat is a mitigating factor that the State must prove in addition to the elements of murder. Sudden heat must be separately proved . . . .

*Suprenant v. State,* 925 N.E.2d 1280, 1282 (Ind. Ct. App. 2010), *trans. denied.* Sudden heat "exists when a defendant is 'provoked by anger, rage, resentment, or terror, to a degree sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.'" *Brantley v. State,* 91 N.E.3d 566, 572 (Ind. 2018) (quoting *Isom v. State,* 31 N.E.3d 469, 486 (Ind. 2015), *cert. denied*, 136 S. Ct. 1161 (2016)).

[19] Importantly, conflict, argument, and fighting alone do not give rise to a finding of sudden heat. Instead, one must be provoked by more than "mere words" and "the provocation must be sufficient to obscure the reason of an ordinary man," judged by an objective standard. *Suprenant,* 925 N.E.2d at 1282-83 (quotations and citations omitted). Accordingly, we must determine whether the trial court, as fact finder, improperly found evidence that Williams knowingly or intentionally killed Brown, instead of finding evidence of sudden heat.

[20] The record reveals there was evidence of anger and an argument on the night of Brown's death. Brown and Williams argued intermittingly throughout the night, which resulted in Brown hitting Williams with a broom. These facts, however, fail to support the allegation that Williams killed Brown under sudden heat. Williams acknowledges his response, on some level, was "irrational" stating, "[t]his irrational response was made with less than seconds to reflect, rather than a knowing determination to inflict harm." Appellant's Br. p. 14. Moreover, the evidence also demonstrated that Williams previously shot at a car that Brown rode in with her children and threatened to kill Brown both via text message and verbally in the month before Brown's death. Williams made it known on more than one occasion that he would kill Brown if she continued to behave in a way that Williams did not like. *See Earl v. State,* 715 N.E.2d 1265, 1267 (Ind. 1999) (noting that evidence regarding the night before the murder where defendant threatened to kill the victim with a shovel and a meat cleaver was a "statement of intent [that] foreshadowed events to come and

served to illustrate premeditation and calculation, rather than the sudden heat asserted by Defendant").

[21] Ultimately, "[e]xistence of sudden heat is a classic question of fact to be determined by the [fact-finder]." *Brantley,* 91 N.E.3d 566 (quoting *Fisher v. State,* 671 N.E.2d 119, 121 (Ind. 1996)). The trial court, after hearing all the evidence, especially the evidence regarding Williams' prior threats and actions, concluded that Williams was not acting under sudden heat but, instead, knowingly or intentionally killed Brown. The evidence was sufficient to reach this conclusion beyond a reasonable doubt, and we will not reweigh the evidence to reach a different conclusion. *See Earl,* 715 N.E.2d at 1267 ("the trial court, as finder of fact, had the responsibility of balancing [presented evidence of sudden heat] against that suggesting that Defendant intentionally killed [the victim] and was not acting in sudden heat"). Accordingly, the evidence was sufficient to convict Williams of murder.

## Conclusion

[22] The evidence is sufficient to convict Williams of murder. We affirm.

[23] Affirmed.

Crone, J., and Bradford, J., concur.