FILED

Sep 08 2016, 9:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Joseph P. Hunter
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Donald J. Burns,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 8, 2016

Court of Appeals Case No.
27A02-1510-CR-1785

Appeal from Grant Circuit Court.
The Honorable Mark E. Spitzer,
Judge.
Cause No. 27C01-1310-MR-5

**Sharpnack, Senior Judge**

# Statement of the Case

Donald Burns appeals his convictions for murder, a felony,[1] two counts of forgery, as Class C felonies,[2] theft as a Class D felony,[3] and two counts of receiving stolen property, as Class D felonies.[4] He also was found to be an habitual offender.[5] He alleges the trial court abused its discretion when it admitted certain photographs at trial, and that there is insufficient evidence of his intent to kill the victim to support a conviction of murder. We affirm.

# Issues

Burns raises the following restated issues for our review:

> I.    Whether the trial court abused its discretion when it admitted into evidence photographs of the victim's remains; and
>
> II.   Whether there was sufficient evidence of his intent to kill the victim to support his conviction for murder.

# Facts and Procedural History

The facts most favorable to the verdict are as follows. Burns was in financial straits in June of 2011. He had been served an eviction notice for failure to pay

---

[1] Ind. Code § 35-42-1-1(1) (2007).

[2] Ind. Code § 35-43-5-2(b)(4) (2006).

[3] Ind. Code § 35-43-4-2(a) (2009).

[4] Ind. Code § 35-43-4-2(b) (2009).

[5] Ind. Code § 35-50-2-8 (2005).

fees associated with his trailer and lot rental, and a disconnect warning for failure to pay his utility bills. He no longer was engaged in full-time employment, and instead worked sporadically performing menial labor.

[4] At some point on the day of June 13, 2011, Burns made contact with his seventy-four-year-old aunt, Dorothy Hurd. Hurd left her home with Burns, leaving a note for Robert "Bob" King, a friend of hers, stating: "Bob[,] I'll be back in a little bit. Went to the cemetery with Little [Donnie]." Tr. p. 181. The cemetery was located in Noblesville, Indiana, and was where her late husband as well as Burns' deceased father (Hurd's brother) were buried. Burns murdered Hurd and left her body in a thicket just off an access road near the Mississinewa River in Grant County in an area where Burns had fished in the past.

[5] Later that evening, Burns used Hurd's credit card to purchase three gold necklaces from the jewelry department at Walmart (located in Marion, Indiana) and attempted a second purchase from the jewelry counter which was rejected by the card service. At 5:20 p.m. on that day, Burns pawned Hurd's wedding ring set at the EZ Pawn located in Marion, Indiana. He drove to his wife Janel Bishir's home in Sweetser, Indiana, and left for her an envelope containing (among other things) a greeting card, a ring belonging to Hurd that had been given to Hurd by Bob King, and one of the gold necklaces that had been purchased by Burns using Hurd's credit card.

[6] On June 14, 2011, when members of Hurd's family could not reach her by telephone, they went to her home and found the note Hurd had left taped to the side door window. They checked the voicemail on her phone and heard a message from Hurd's bank that some suspicious transactions had been made and attempted with her credit card. They called the police.

[7] A police officer drove to Burns' trailer and attempted to speak with him about Hurd's disappearance. At the time, Burns was on parole for a prior conviction. When the officer spotted Burns and called to him, Burns jumped into his vehicle and drove away. The officer pursued Burns and Burns soon stopped his vehicle and surrendered. Burns was taken into custody. That evening, a resident of the trailer park where Burns lived found a plastic bag on the premises containing Hurd's VISA credit card that had been used by Burns at Walmart, a JC Penney credit card in Hurd's name, a blank check from Hurd's checking account, and two gold necklaces.

[8] While being held in jail, Burns wrote to his wife Janel Bishir urging her to "take those two things I gave you . . . and flush them down the toilet;" and, "get rid of them" so that "no one will ever know." Tr. p. 594. Burns sent the letter sometime during the last week of June, 2011.

[9] The police investigation of Hurd's disappearance led to evidence of the above stated facts and that Burns' cell phone, which Burns had told the police was always with him, had been used in the vicinity of Mississinewa River at 1:05 p.m. on June 13, 2011, the day of Hurd's disappearance. A search eventually

led to the discovery of Hurd's remains on February 9, 2012. A forensic investigation showed that Hurd had been struck multiple times, causing several factures to her skull and jaw prior to her death. Evidence was presented that her death, most likely, was due to that trauma, and that such trauma could not have been accidentally inflicted or inflicted by Hurd herself.

The remains were a skeletal torso and upper legs, scattered other bones, and a skull separated from the torso. It was concluded that Hurd's body had been subjected to scavenging animals, causing the separation of the body and skeleton into pieces.

Burns was charged with Hurd's murder, one count of theft, two counts of forgery, and two counts of receiving stolen property. At the conclusion of the trial, the jury found Burns guilty as charged and also found him to be an habitual offender. Burns received a total sentence of 103 years. He now appeals.

## Discussion and Decision

### I. Admissibility of Photographs

Burns contends that the trial court erred in admitting photographs of the site where Hurd's bodily remains were discovered, photographs of Hurd's bodily remains, and autopsy photographs. Burns argues the prejudice attributable to the photographs' gruesomeness substantially outweighed their probative value, that some photographs were cumulative and duplicative, and that some photographs were taken after medical intervention or after the autopsy was

completed. The State maintains the photographs were properly admitted "because they were probative, relevant, accurate representations of the crime." Appellee's Br. p. 18.

The admission and exclusion of evidence falls within the sound discretion of the trial court. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). This Court reviews the admission of photographic evidence only for an abuse of discretion. *Pruitt v. State*, 834 N.E.2d 90, 117 (Ind. 2005), *cert. denied*; *Ealy v. State*, 685 N.E.2d 1047, 1049-50 (Ind. 1997). Photographs may be excluded only if their probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403; *see also*, *Byers v. State*, 709 N.E.2d 1024, 1028 (Ind. 1999). No claimed error in admitting photographs will prevail "unless a substantial right of the party is affected." Ind. Evidence Rule 103(a); *see also*, *Pruitt*, 834 N.E.2d at 117; *Corbett v. State*, 764 N.E.2d 622, 628 (Ind. 2002). "Whether an appellant's substantial rights are affected is determined by examining the 'probable impact of that evidence upon the jury.'" *Pruitt*, N.E.2d at 117 (quoting *Corbett*, 764 N.E.2d at 628).

Generally, photographs that depict a victim's injuries or demonstrate the testimony of a witness are admissible. *Corbett*, 764 N.E.2d at 627 (citing *Fentress v. State*, 702 N.E.2d 721 (Ind. 1998)); Ind. Evidence Rules 401, 402. Photographs that may be gruesome in nature are admissible if they act as interpretive aids for the jury and have strong probative value. *Spencer v. State*, 703 N.E.2d 1053, 1057 (Ind. 1999). Though autopsy photographs have been found to be inadmissible to avoid the risk that the finder of fact could

mistakenly infer that the defendant inflicted the autopsy incision, *Allen v. State*, 686 N.E.2d 760, 776 (Ind. 1997), *cert. denied*, exclusion of such photographs is not necessary if they are accompanied by testimony to explain what had been done to the body, thus minimizing the potential for confusion and showing that the probative value outweighed the prejudicial effect. *Corbett*, 764 N.E.2d at 627 (citing *Fentress*, 702 N.E.2d at 722).

[15] Burns challenges the admission of twenty-eight photographs, over his objections at trial, which included eleven photographs of Hurd's skull, six photographs of her torso, two photographs of her hand, seven photographs depicting either the site where Hurd's remains were found or the remains themselves in the condition in which they were discovered, and two photographs showing Hurd's torso at the time the autopsy was performed.[6] The admission of these photographs was not error.

[16] No incisions were made to Hurd's remains during the autopsy. The forensic pathologist testified that the autopsy performed on Hurd's remains was not "a full autopsy," and that "[t]he coroner requested that I don't do any kind of incision or invasive testing." Tr. p. 841. The remainder of the photographs show Hurd's remains as they were on the day they were found and on the following day when the remains were recovered.

---

[6] Four photographs, two depicting the site where Hurd's remains were found and two showing Hurd's skull lying in the woods, were admitted into evidence without objection.

The Indiana State Police crime scene investigator who was present when Hurd's remains were found and recovered testified that the other twenty-six pictures, admitted over objection, depicted the site where Hurd's remains were found, the actual remains as they were found, and that Hurd's skull was found some distance from her torso and from where other remains were found. *See, e.g., Amburgey v. State*, 696 N.E.2d 44, 45 (Ind. 1998) (gory and revolting photographs may be admissible if they are relevant to some material issue or show scenes that a witness could describe orally).

Burns does not put forth an argument that his substantial rights were affected by the admission of the photographs and does not argue how the admission of the photographs might have prejudiced the jury. Furthermore, evaluating whether the photographs' probative value was substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court. *See Dunlap v. State*, 761 N.E.2d 837, 842 (Ind. 2002). The photographs, although unpleasant, were relevant to material issues and to the testimony of the criminal investigator and the forensic pathologist. We do not find any abuse of discretion by the trial court in admitting the photographs over Burns' objections.

## II. Sufficiency of the Evidence of Intent to Kill

Burns next contends that insufficient evidence was presented by the State to prove beyond a reasonable doubt that he intended to kill Dorothy Hurd. Our standard of reviewing claims relating to sufficiency of the evidence is well

established. On appeal, we do not weigh the evidence or judge the credibility of witnesses. *Banks v. State*, 567 N.E.2d 1126, 1129 (Ind. 1991). We consider only that evidence most favorable to the verdict together with all reasonable and logical inferences to be drawn therefrom. *Id*. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be disturbed. *Id*. A conviction of murder may be sustained on circumstantial evidence alone. *Green v. State*, 587 N.E.2d 1314, 1315 (Ind. 1992). The reviewing court need not determine that circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but only that an inference may reasonably be drawn which supports the finding of guilt. *Smith v. State*, 468 N.E.2d 512, 515 (Ind. 1984).

[20] Burns was charged with knowingly or intentionally killing another human being. *See* Ind. Code § 35-42-1-1. "A person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (1977). An intent to kill sufficient to sustain a murder conviction can be established in several ways. The intent to kill may be inferred from the use of a deadly weapon. *Chapman v. State*, 719 N.E.2d 1232, 1234 (Ind. 1999). Intent may be inferred from the nature of the attack and the circumstances surrounding the crime. *Corbin v. State*, 563 N.E.2d 86, 88 (Ind. 1990). The duration and brutality of the attack and the relative strengths of the defendant and victim may also indicate an intent to kill. *Gibson v. State*, 515 N.E.2d 492, 496 (Ind. 1987); *see also Shackelford v. State*, 264 Ind. 698, 702-04, 349 N.E.2d 150, 154 (1976). Additionally, where blows of magnitude are

repeated, a jury could conclude that the defendant had an intent to kill. *Nunn v. State*, 601 N.E.2d 334, 339 (Ind. 1992).

[21] Burns argues there was insufficient evidence of his intent to kill because the cause and manner of Hurd's death were undetermined and no formal autopsy was performed. We disagree. Hurd's remains were found eight months after her disappearance in a remote part of the Mississinewa River area, in a thicket located off of an access road in a wooded area. Evidence indicated Burns was familiar with the area because he fished the Mississinewa River. Forensic analysis revealed that Hurd suffered multiple fractures to her skull. A forensic pathologist testified at trial that the most likely cause of Hurd's death was a head injury inflicted by another person. A forensic anthropologist testified that Hurd suffered blunt force trauma to the left side of her face, her cheek bone, and her lower jaw; that the trauma occurred "around the time of [Hurd's] death;" and that the trauma did not occur after Hurd's death. Tr. p. 806. She further testified that the trauma could have been caused by a baseball bat or some other "long" instrument like a crow bar that could impact both the middle of Hurd's chin and her cheek bone at the same time. *Id*. at 814.

[22] Evidence was presented that Hurd told one of her daughters that she wanted to meet with "little Donnie" so that she could give him family photographs. Other evidence was presented showing Burns was not doing well financially, was not steadily employed, was perpetually behind in paying his rent, and was behind in paying his electricity bill. On the day that Hurd was last heard from by relatives, Hurd left a note taped to the side door of her Noblesville, Hamilton

County, Indiana, residence that indicated she was going to the cemetery with Burns. Early in the afternoon on that day, Burns' cell phone, which evidence indicated he always carried with him, was used near the area where Hurd's remains were found, a remote area of Grant County near the Mississinewa River. Later still that day, Burns was seen in a Walmart in Marion, Indiana, using Hurd's credit card to make jewelry purchases, and in a pawn shop pawning Hurd's wedding ring set. Also on that day, Burns delivered to his wife one of the necklaces he purchased at Walmart using Hurd's credit card and a ring that belonged to Hurd. Evidence indicated that Burns must have taken Hurd's property from her person, as there were no signs of forced entry into Hurd's home, and evidence was presented that Hurd rarely removed her wedding ring set from her finger.

[23]     When a police officer attempted to approach Burns and question him about the disappearance of Hurd, Burns fled. After Burns was apprehended and questioned, he showed no concern and asked no questions about Hurd's disappearance. Burns also lied to the police when he was asked his whereabouts on the day of Hurd's disappearance. While incarcerated and awaiting trial, Burns wrote to his wife and told her to "get rid" of the items he gave her and to deny knowledge of the gifts. Tr. p. 594. He also wrote that "things just got so out of control." Tr. p. 595. Hurd was a five foot two inch, seventy-four-year-old woman of slight build. Burns was a five foot ten inch, forty-seven-year-old man weighing approximately 190 pounds. The multiple blows to Hurd's head and consequent fractures support an inference of intent to

kill.  The fact that Hurd knew Burns and that he could not avoid prosecution for robbing her if she lived to tell of it also supports an inference of intent to kill.

[24] Although no single fact proves Burns' intent to kill Hurd, we find that the collective circumstantial evidence was sufficient to allow a reasonable jury to infer that Burns intended to kill Hurd.  Considering these facts together, the jury could have found beyond a reasonable doubt that Burns intended to kill Dorothy Hurd.  Thus, sufficient evidence supports Burns' murder conviction.

## Conclusion

[25] For the reasons stated above, the judgment of the trial court is affirmed.

[26] Affirmed.

Robb, J., and Altice, J., concur.