# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 21 2019, 8:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael R. Fisher
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dequarius Walker, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | August 21, 2019 <br><br> Court of Appeals Case No. 19A-CR-124 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Ruth Reichard, Senior Judge <br><br> Trial Court Cause No. 49G02-1805-MR-14809 |

**Tavitas, Judge.**

## Case Summary

Dequarius Walker appeals his conviction and sentence for murder. We affirm.

## Issues

Walker raises four issues, which we restate as:

I.   Whether the trial court erred in refusing Walker's jury instruction on involuntary manslaughter as a lesser included offense.

II.  Whether the trial court committed fundamental error when it failed to sua sponte instruct the jury on reckless homicide.

III. Whether the evidence is sufficient to convict Walker of murder.

IV.  Whether Walker's sentence is inappropriate in light of the nature of the offense and Walker's character.

## Facts

In May 2018, Jalisa Lacey lived on the West side of Indianapolis with her three young daughters. Walker and Lacey were in a relationship, and Walker fathered Lacey's youngest daughter; however, the couple's relationship had ended prior to May 2018.

In the early morning hours of May 2, 2018, Lacey and her friend, Dennis Hendon, were drinking together on Lacey's porch while Lacey's young daughters slept inside the house. While Lacey and Hendon were on the porch,

Walker approached from the back side of Lacey's home. Walker also lived in the neighborhood with his girlfriend. When Walker approached Lacey, Walker appeared to be "drunk." Tr. Vol. II p. 40. Walker asked Lacey what she was doing outside late at night, took Hendon's cigarettes, and poured Lacey's drink on her.

[5] Lacey requested Walker leave several times, but Walker refused. Lacey telephoned Walker's aunt, Marilyn Johnson, to encourage Walker to leave Lacey's home. Meanwhile, Walker continued to act disrespectfully to Lacey and Hendon and called Lacey names such as "w****." *Id.* at 43. Johnson arrived and Walker became upset that Lacey called Johnson. Johnson also believed that Walker had been drinking based on Johnson smelling the alcohol on Walker. After Johnson asked Walker to leave Lacey's home, Walker responded that he would not leave.

[6] Subsequently, a series of events unfolded which Lacey and Johnson understood differently. According to Lacey's testimony, Lacey went inside her home and Walker followed her. Then, Lacey and Walker went outside and Walker "grabb[ed her] hair, [and tried] to choke [her]." *Id.* at 47. The altercation between Lacey and Walker occurred near Johnson's car. Lacey testified that Johnson told Walker to leave Lacey alone during the altercation.

[7] Lacey further testified that Hendon picked up a "baseball bat"—which the evidence revealed to be a wooden board—and hit Walker while telling Walker to "leave [Lacey] alone." *Id.* at 50. Surveillance video from the nearby store

shows Hendon picking up the board off the sidewalk. Walker then "[took] the [same board] and start[ed] hitting [Hendon]." *Id.* at 51. Lacey ran away after Hendon hit Walker with the board. Lacey testified that she was not exactly sure where Walker hit Hendon on his body or how many times Walker hit Hendon.

[8] According to Lacey's testimony, after Walker hit Hendon, Walker ran away through a nearby alley. Hendon appeared to be "dazed out" on the ground. *Id.* at 52. Johnson and Lacey picked Hendon up off the ground, and Lacey called the police.

[9] Johnson's account differs from Lacey's. Johnson testified that she never saw Walker touch Lacey. Johnson also testified that, at the time of the incident, Johnson asked Lacey if Walker touched Lacey, to which Lacey responded that Walker had not. Johnson testified that, while her back was to the men, she did not hear any arguing or yelling; however, Johnson heard "one loud crack." *Id.* at 105. Johnson then turned around and observed Walker standing over Hendon with the board. Walker "again" attempted to hit Hendon with the board; however, Johnson took the board from Walker and "popped [Walker] with it twice" before she shoved Walker to the ground. *Id.* at 106. Johnson also acknowledged that she told the police that Walker was "beating on [Hendon]" because Hendon was "talking noise to [Walker] all day." *Id.* at 108-109.

[10] After the incident, Johnson continued to speak with Hendon while Lacey called the police. Johnson also testified that, at first, Hendon did not respond to her or Lacey's voice; however, "[a]fter about two minutes, he started to come around on his own," and Johnson told Lacey not to move Hendon until the medics arrived. *Id.* at 111.

[11] Walker also testified in his defense and told a completely different version of events. Walker stated that he was speaking with Lacey when suddenly he felt something hit the back of his head and turned to see Hendon with the board. Walker testified that Hendon hit him about six times, then Walker tried to defend himself by taking the board away, and in doing so, Hendon fell down when Walker was finally able to take the board away from Hendon. Walker claims that he also attempted to help Hendon up once he fell.

[12] Officer Jon King with the Indianapolis Metropolitan Police Department arrived at Lacey's home at approximately 1:00 a.m., and the medics arrived shortly thereafter. Hendon was "lethargic, [and] disoriented," he had no visible injuries, and Hendon walked to the ambulance on his own. *Id.* at 86. After Officer King and the medics evaluated Hendon, Hendon went inside his home. Hendon's home was above the Blue Store, near Lacey's home.

[13] Later on May 2, 2018, Lacey went to the Blue Store and told another employee, Janice Weaver, that someone should check on Hendon based on the events that occurred earlier that morning. Walker also went into the store later, and Weaver asked Walker why Walker hit Hendon. Walker replied to Weaver that

Hendon "shouldn't have been in [Walker's] f****** business." *Id.* at 214. Weaver sent someone to check on Hendon and found Hendon unresponsive, and 911 was called.

[14] When medics arrived at Hendon's residence at 6:55 p.m. on May 2, 2018, Hendon was unresponsive, his skin was hot, he had an injury on the left side of his head, and he had blood in his left ear. Hendon was breathing, but his heart rate was high. Hendon was transported to the hospital and later died.

[15] On May 3, 2018, the neighborhood had a vigil for Hendon and neighbors spotted Walker and chased him. Police were called and they found Walker in a crawl space in his girlfriend's home where he was arrested. The photos taken by the police of Walker's injuries after his arrest demonstrated only minor injuries, including minor scabs and scarring, which did not appear to be the result of new wounds.

[16] On May 8, 2018, Walker was charged with Count I, murder, and Count II, domestic battery, a Class A misdemeanor. On November 21, 2018, the State filed a motion to dismiss Count II, which the trial court granted. Accordingly, a new information was filed on November 26, 2018, alleging only Count I, murder, stating: "[o]n or about May 2, 2018, [Walker] did knowingly or intentionally kill another human being, to-wit: Dennis Hendon." Appellant's App. Vol. II p. 92.

[17] Walker's jury trial took place in November 2018, and witnesses testified to the foregoing facts. Dr. Scott Shapiro, a neurosurgeon, testified that Hendon was

admitted to the hospital on May 2, 2018, and died the next day. Hendon's CAT scan demonstrated that Hendon had a "catastrophic intracerebral hemorrhage," which indicated a "[v]ery large hemorrhage in the brain itself." Tr. Vol. II p. 139. Dr. Shapiro further testified that Hendon had a "subdural hemorrhage which is usually a manifestation of some type [of] traumatic event." *Id.* at 140. He stated that: "[t]he intracerebral hemorrhage can be caused by a number of things other than trauma but [it is seen] all the time in trauma." *Id.* Hendon also experienced bleeding in his "subarachnoid space," the space in which "you can get little bleeding in the interstices of all the convolutions of the brain," as well as fractures along the base of his skull. *Id.* at 140-41. Hendon's brain injuries were summarized as "bleeding within the brain, on top of the brain and then in another layer that surrounds the brain." *Id.* at 141. Finally, in terms of brain damage, Hendon had a "massive shift" of his brain that "was almost an inch in shift which is catastrophic." *Id.* Dr. Shapiro classified the brain shift as "just a disaster to have happen." *Id.* at 142.

[18] Hendon's medical records also indicated that Hendon had a bruise above one eye and blood behind one of his eardrums or coming out of Hendon's ear. Dr. Shapiro observed that this is seen often in trauma, "especially when there's [a] skull base fracture." *Id.* at 143. Hendon, accordingly, was "brain-dead on exam and the scan was unrecusable," meaning Hendon's chance of survival was "zero." *Id.* Dr. Shapiro stated that he had "no idea what happened to [Hendon]" and that the injuries "could have been from a fall." *Id.* at 144.

[19] Dr. Christopher Poulos, the chief forensic pathologist with the Marion County Coroner's Office, testified that Hendon was five-foot-seven-inches and 106 pounds and had several external and internal injuries. Hendon's external injuries included a scrape on the back of the right shoulder, a bruise and scrapes on the left elbow, a scrape on the knee, and scrapes on the left lower leg and right lower leg. Hendon's internal injuries included a fracture of the "cornua of the thyroid cartilage," an injury to the head which resulted in "a lot of bleeding" as the most significant injury, and chest wall hemorrhage between the ribs on Hendon's back, consistent with blunt force injuries. *Id.* at 193, 197. Dr. Poulos did not believe Hendon's injuries on his neck were consistent with injuries typically sustained in a fall. Dr. Poulos determined Hendon's cause of death to be "blunt force injury to the head" and ruled Hendon's death a homicide. *Id.* at 197.

[20] After all evidence was presented, the parties discussed final jury instructions. The trial court considered Walker's proposed final jury instructions on self defense and involuntary manslaughter. Walker argued that an involuntary manslaughter instruction was warranted because the State put into evidence facts that would indicate Hendon was killed as a result of a battery. After argument and discussion, the trial court concluded:

> But what [the Court of Appeals says] is when the State drafts a charge of Murder that is "knowingly or intentionally killed another human being" and they don't also allege in the information "while committing a battery" or "while committing an armed robbery" or while, you know, "holding someone at gunpoint," whatever, that forecloses involuntary manslaughter.

And, like I said, I could see some wiggle room if the facts had been different into evidence. But based on the defendant's testimony, that is, you know, as I said, I would characterize as non-commission, in other words, not even committing a battery, you know, when this happened and certainly it's not charged in a way that he was committing another crime, I honestly do not think involuntary manslaughter is on the table here as a lesser included.

Tr. Vol. III p. 54. The trial court declined to give the involuntary manslaughter instruction; however, the trial court found that a self defense instruction was supported by the evidence and instructed the jury regarding self defense. The jury found Walker guilty of murder.

[21]     Walker was sentenced on December 18, 2018. The trial court found, as aggravating factors, Walker's criminal history and the fact that Walker was serving a sentence for a crime of violence at the time of the instant offense.[1] The trial court found as mitigating factors that incarceration would be a hardship on Walker's dependent children and that Walker made a statement of remorse. The trial court found that the aggravators outweighed the mitigators and Walker was sentenced to fifty-eight years in the Department of Correction. Walker now appeals his conviction and sentence.

---

[1] Walker's pre-sentence investigation report indicates that Walker was convicted and awaiting a sentence for a February 6, 2018 charge for resisting law enforcement, a Class A misdemeanor (the "prior offense"), at the time of the instant offense. Walker was sentenced in the prior offense the day before charges were filed against him in the instant offense.

**Analysis**

***I.    Involuntary Manslaughter Instruction***

Walker argues that the trial court erred in refusing to tender Walker's proposed instruction on involuntary manslaughter. "The trial court has broad discretion as to how to instruct the jury, and we generally review that discretion only for abuse." *Kane v. State,* 976 N.E.2d 1228, 1231 (Ind. 2012) (citing *Mayes v. State,* 744 N.E.2d 390, 394 (Ind. 2001)). The abuse of discretion standard applies when the trial court makes a factual decision regarding whether to tender the instruction to the jury. *See Brown v. State,* 703 N.E.2d 1010, 1019 (Ind. 1998). On the other hand, "if the trial court rejects the tendered instruction on the basis of its view of the law, as opposed to its finding that there is no serious evidentiary dispute, appellate review of the ruling is de novo." *Id.* Under either standard, Walker's argument fails.

In *Evans v. State,* 727 N.E.2d 1072, 1080-81 (Ind. 2000), our Supreme Court summarized the law regarding the issue of whether a trial court should instruct on a lesser included offense:

> In *Wright v. State,* 658 N.E.2d 563 (Ind. 1995), this Court set forth a three-part test for determining when a trial court should instruct on a lesser included offense. Part one requires the trial court to determine whether the lesser offense is "inherently" included in the offense charged by comparing the statute defining the crime charged with the statute defining the alleged lesser included offense. *Id.* at 566-67; *see also Wilson v. State,* 697 N.E.2d 466, 473 (Ind. 1998). If necessary, part two of the *Wright* test alternatively requires the trial court to determine whether the lesser offense is "factually" included in the offense charged by comparing the

charging instrument with the statute defining the alleged lesser included offense. *Wright,* 658 N.E.2d at 567.

> Finally, if the court concludes that the lesser offense is either inherently or factually included in the offense charged, then part three requires the court to determine whether a serious evidentiary dispute exists as to which offense was committed by the defendant, given all the evidence presented by both parties. *Id.* If a serious evidentiary dispute does exist, it is reversible error not to give the instruction on the inherently or factually included lesser offense. *Id.*

[24] As for the first question of whether involuntary manslaughter is inherently included as a lesser offense of murder, Walker concedes that Indiana case law indicates that involuntary manslaughter is not inherently included; however, Walker argues that, "especially as it applies here, [this case law] is erroneous and should be revisited." Appellant's Br. pp. 23-24. To the extent Walker is inviting us to disagree with our Supreme Court, we decline to do so. *See Gill v. Gill,* 72 N.E.3d 945, 949 (Ind. Ct. App. 2017) (finding that "as Indiana's intermediate appellate court, we are bound to follow Indiana Supreme Court precedent"). Instead, we will turn to the next step to consider whether involuntary manslaughter was factually included in this case.

[25] The trial court did not tender to the jury Walker's involuntary manslaughter instruction, concluding that the way in which the State drafted the charging information factually precluded involuntary manslaughter. Still, Walker argues that the State's ability to do so defies notions of fairness "because it is logically

impossible to have killed a person without necessarily committing a lesser offense." Appellant's Br. p. 24.

[26] The amended charging information stated: "On or about May 2, 2018, [Walker] did knowingly or intentionally kill another human being, to-wit: [Hendon]." Appellant's App. Vol. II p. 23. Indiana Code section 35-42-1-4(b) provides:

> A person who kills another human being while committing or attempting to commit:
>
>> (1) a Level 5 or Level 6 felony that inherently poses a risk of serious bodily injury;
>>
>> (2) a Class A misdemeanor that inherently poses a risk of serious bodily injury; or
>>
>> (3) battery;
>
> commits involuntary manslaughter, a Level 5 felony.

[27] The charging information does not indicate that a battery occurred. Accordingly, the trial court was not required to find that involuntary manslaughter is a factually lesser included crime here. *See Wright,* 658 N.E.2d at 570 ("the State may only foreclose instruction on a lesser offense that is not inherently included in the crime charged by omitting from a charging instrument factual allegations sufficient to charge the lesser offense."); *see c.f., Evans,* 727 N.E.2d at 1081 (finding that, because the charging information

alleged that the defendant killed the victims by means of a knife, involuntary manslaughter was a factually included lesser offense).

[28] Based on the State's charging information, no facts or battery were alleged that would make involuntary manslaughter a factually included lesser offense here. The trial court did not err in declining to instruct the jury on involuntary manslaughter because it was neither an inherently included offense or a factually included offense based on the charging information. Accordingly, we need not move to step three of the *Wright* analysis. *See Norris v. State,* 943 N.E.2d 362, 369 (Ind. Ct. App. 2011) (the trial court "needlessly advanced to step three" because, "[b]ased on the State's drafting of the murder charge, instruction on involuntary manslaughter was foreclosed in this case."), *trans. denied*.

## II. *Reckless Homicide Instruction*

[29] Walker next argues that the trial court erred in failing to, sua sponte, give a reckless homicide instruction to the jury as a lesser included offense. Walker failed to request a jury instruction on reckless homicide; therefore, we will review only for fundamental error. As the State correctly points out, the trial court raised the issue of reckless homicide, arguing that, like voluntary manslaughter, the trial court determined that the facts did not warrant an instruction on reckless homicide and Walker never rebutted the trial court's statement or argued to the contrary.

[30]     "An error may be fundamental and thus not subject to waiver, if it is a 'substantial blatant violation of basic principles.'" *Barthalow v. State,* 119 N.E.3d 204, 211 (Ind. Ct. App. 2019) (quoting *Moreland v. State,* 701 N.E.2d 288, 294 (Ind. Ct. App. 1998)).  The error "must be so prejudicial to the defendant's rights as to make a fair trial impossible." *Id.*  Fundamental error is saved for only "egregious circumstances." *Id.*

[31]     In *Lane v. State,* 953 N.E.2d 625, 630 (Ind. Ct. App. 2011), a panel of this Court summarized the law on this issue as follows:

> To the extent Lane argues that failure to give an instruction on conversion amounted to fundamental error, his claim fails. Essentially, Lane's argument is that the trial court was required to *sua sponte* give the instruction on conversion despite counsel's strategic decision.  Our Supreme Court has rejected this notion, holding that a trial court's failure to *sua sponte* give instructions on lesser-included offenses does not constitute fundamental error. *See Metcalf v. State,* 451 N.E.2d 321 (Ind. 1983); *see also Sarwacinski v. State,* 564 N.E.2d 950 (Ind. Ct. App. 1991).  To be sure, our Supreme Court stated in *Helton v. State,* 273 Ind. 211, 213, 402 N.E.2d 1263, 1266 (1980) that "the entitlement to included offenses instructions, in an appropriate case, is not a fundamental right but rather is one that must be claimed and the claim preserved, in accordance with established rules of trial and appellate procedure."  The omission of an instruction on the lesser-included offense of conversion did not constitute fundamental error.

[32]     Walker attempts to distinguish his case from *Lane,* arguing that here, "there was no possible strategic reason not to seek instruction on the lesser included offense of reckless homicide."  Appellant's Br. p. 27.  We disagree.  Walker's trial

counsel clearly considered lesser included instructions, and even offered a lesser included instruction on involuntary manslaughter. In analyzing the options, trial counsel chose not to offer an instruction on reckless homicide. Even if this was a poor decision, we will not "second guess counsel's strategy through the distortions of hindsight." *Lane,* 953 N.E.2d at 630. Walker's argument fails.

## III. *Sufficient Evidence*

[33] Walker argues the evidence is insufficient to support his murder conviction because: (1) the evidence did not demonstrate that Walker knowingly or intentionally killed Hendon; and (2) the State failed to disprove Walker's self defense claim. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985)). Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84). "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

## A. Knowingly or Intentionally Killed

To convict Walker of murder, the State had to prove that Walker "knowingly or intentionally kill[ed] another human being." Ind. Code § 35-42-1-1. Walker argues that, at the very least, Walker's "reaction, in this brief space of time, may show [Walker] intended to commit a battery or that he acted recklessly, but it is not sufficient to prove he knowingly or intentionally killed [Hendon]." Appellant's Br. p. 15. "A person engages in conduct intentionally if, when he engages in the conduct, it is his conscious objective to do so." I.C. § 35-41-2-2(a). "A person engages in conduct knowingly if, when he engages in the conduct, he is aware of a high probability that he is doing so." I.C. § 35-41-2-2(b).

"An intent to kill sufficient to sustain a murder conviction can be established in several ways." *Burns v. State,* 59 N.E.3d 323, 328 (Ind. Ct. App. 2016), *trans. denied.* Specifically, intent to kill may be inferred from "the use of a deadly weapon," "the nature of the attack and the circumstances surrounding the crime," "[t]he duration and brutality of the attack[,] the relative strengths of the defendant and victim," and "where blows of magnitude are repeated, a jury could conclude that the defendant had an intent to kill." *Id.*

Much of Walker's argument rests on his premise that Hendon's brain injury was caused by a fall to the pavement, and not by being struck on the head. Dr. Poulos testified as follows:

> I can say blunt force trauma. I can say more likely having occurred by – you know, by a fall onto the back of the head like

I've already said.  I can say that – you know, from this injury, I can say it's more likely due to a fall.  The injury on the neck I can say is more likely not due to a fall.

Tr. Vol. II p. 199.  Even though the injury to the head was most significant, Hendon also had injuries to the "left back of the head," and other "multiple internal and external injuries."  *Id.*  Dr. Poulos also noted a chest injury that did not appear to be consistent with CPR, in addition to other injuries that may be consistent with CPR.  Additionally, all the witnesses present that evening testified that Walker hit Hendon with the board, which is consistent with injuries to Hendon's body.

[37]     Walker—who weighs approximately sixty pounds more than Hendon and is many years Hendon's junior—hit Hendon with a wooden board.  The board was of such heft that Lacey thought the board was a baseball bat when she first observed it.  The evidence presented from both Dr. Shapiro and Dr. Poulos demonstrated that the harm caused by Hendon's injuries was severe and, ultimately, fatal.  Even if the fall is what caused Hendon's death, Johnson heard a loud crack and then Hendon fell to the ground with such force that he sustained a fatal injury.  This is the type of evidence from which a jury could infer Walker's intent to kill Hendon.  For us to conclude otherwise would require us to reweigh the evidence, which we cannot do.  *See Gibson,* 51 N.E.3d

at 210. The State presented sufficient evidence regarding the intent element of Walker's murder conviction. [2]

## B. Self Defense

Walker also contends that he presented sufficient evidence of self defense, which the State did not rebut. Pursuant to Indiana Code Section 35-41-3-2(c),

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of unlawful force. However, a person:
>
> (1) is justified in using deadly force; and
>
> (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony.

"A valid claim of self-defense is a legal justification for an otherwise criminal act." *Henson v. State,* 786 N.E.2d 274, 277 (Ind. 2003). "A claim of self-defense requires a defendant to have acted without fault, been in a place where he or

---

[2] Finally, portions of Walker's arguments with regard to the sufficiency of the evidence appear to be that, had the jury been allowed to consider reckless homicide or involuntary manslaughter, Walker would not have been convicted of murder, but instead, would have been convicted of one of the other offenses based on the mens rea. Again, this argument is nothing more than a request for us to reweigh evidence and find another mens rea more applicable, which we cannot do. *See Gibson*, 51 N.E.3d at 210.

she had a right to be, and been in reasonable fear or apprehension of bodily harm." *Id.* "A claim of self-defense will fail if the person uses more force than is reasonably necessary under the circumstances." *Weedman v. State,* 21 N.E.3d 873, 892 (Ind. Ct. App. 2014) (quotations omitted). "Once a defendant claims self-defense, the State must disprove, beyond a reasonable doubt, at least one element of self-defense." *Carroll v. State,* 744 N.E.2d 432, 433 (Ind. 2001). "The State may meet its burden by either rebutting the defense directly or relying on the sufficiency of evidence in its case-in-chief." *Id.* at 434.

[40] In this case, the trial court gave the jury an instruction on self defense. The evidence demonstrates that, although Hendon was the first aggressor between the two men, Walker took the board from Hendon and hit Hendon with the board more than once.[3] Hendon suffered severe injuries—both internally and externally as a result of Walker's actions whereas, as indicated above, the injuries to Walker were minor at best.

[41] In light of the above facts, it was reasonable for the jury to rely on the State's facts in its case in chief to conclude that Walker's response to Hendon was not reasonable and, therefore, to reject Walker's self defense argument. Walker's argument on this element is essentially an invitation for us to reweigh the evidence, which we cannot do. *See Gibson,* 51 N.E.3d at 210.

---

[3] Although Walker testified in his defense and claimed that he merely took the board from Hendon, which caused Hendon to fall and sustain the head injuries, the jury was not required to believe Walker's version of events, especially in light of Lacey's and Johnson's testimony to the contrary.

# IV. *Inappropriate Sentence*

[42] Lastly, Walker contends that his sentence is inappropriate in light of the nature of the offense and Walker's character. Indiana Appellate Rule 7(B) provides that this court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Wilson v. State,* 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied.*

[43] In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference." *Sanders v. State,* 71 N.E.3d 839, 844 (Ind. 2017) (quoting *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008)). In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "if another sentence might be *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *Sanders,* 71 N.E.3d at 844 (citing *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)).

[44] We look to the statutory ranges established for the classification of the offense. Walker was found guilty of murder. The sentence for murder ranges from forty-five years to sixty-five years, with an advisory sentence of fifty-five years. I.C. § 35-50-2-3. Walker was sentenced to fifty-eight years.

[45] We first review the nature of Walker's offense. Walker hit Hendon—a much smaller and older man—with a board and using such force that Hendon sustained serious head injuries. The head injuries were so extensive that no reasonable neurosurgeon would operate on Hendon.[4]

[46] Next, we consider Walker's character. Walker's criminal history does not reflect well upon his character. Twenty-three-year-old Walker's criminal history includes convictions for intimidation, a Class D felony; resisting law enforcement, a Class A misdemeanor; intimidation, a Class D felony; theft, a Class D felony; battery, a Class A misdemeanor; dealing in a controlled substance, a Level 6 felony; resisting law enforcement, a Class A misdemeanor; resisting law enforcement, a Class A misdemeanor; resisting law enforcement using a vehicle, a Level 6 felony; leaving the scene of an accident, a Class B misdemeanor; criminal confinement, a Level 6 felony; strangulation, a Level 6 felony; domestic battery in the presence of a child under sixteen, a Level 6 felony; and resisting law enforcement, a Class A misdemeanor.

[47] As discussed above, the trial court found, as aggravating factors, Walker's criminal history and the fact that Walker was serving a sentence for a crime of

---

[4] In part of his argument, Walker argues that part of the reason his sentence is inappropriate is because of the trial court's statement that Hendon was "beaten to death." Tr. Vol. III p. 140. According to Walker, this statement does not properly characterize the evidence. We will not parse the trial court's language to determine if this is a fair characterization of the evidence because, although we review the nature of the offense for purposes of inappropriateness of Walker's sentence, the trial court did not consider the nature of the offense to be an aggravator. *See id.* ("That being said, I'm not sure the nature and circumstances of the crime are an aggravator. I think they're elements of the crime and, for example, the harm was significant."). The same is true of the photograph the State admitted into evidence at Walker's sentencing.

violence at the time of the instant offense. The trial court found two mitigating factors: that (1) incarceration would be a hardship on Walker's dependent children; and (2) Walker made a statement of remorse. The trial court weighed the aggravating and mitigating factors and found that the aggravators outweighed the mitigators. Accordingly, the trial court sentenced Walker to three years above the advisory sentence. We cannot say this was inappropriate.

## Conclusion

[48] The State's evidence was sufficient to convict Walker of murder, and the State presented sufficient evidence to rebut Walker's claim of self defense. The trial court did not err in failing to instruct the jury on involuntary manslaughter, and it was not fundamental error for the trial court to fail to, sua sponte, instruct the jury on reckless homicide. Additionally, Walker's sentence is not inappropriate. We affirm.

[49] Affirmed.

Crone, J., and Bradford, J., concur.