# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 31 2019, 7:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James Harper
Valparaiso, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Josiah J. Swinney
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas K. Jackson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

December 31, 2019

Court of Appeals Case No.
19A-CR-796

Appeal from the LaPorte Superior Court

The Honorable Michael Bergerson, Judge

Trial Court Cause No.
46D01-1704-F3-367

**Tavitas, Judge.**

## Case Summary

Thomas Jackson appeals his convictions and sentence for three counts of rape, Level 3 felonies. We affirm.

## Issues

Jackson raises three issues for our review, which we restate as:

> I. Whether the evidence was sufficient to convict Jackson of rape.
>
> II. Whether the trial court abused its discretion in sentencing Jackson.
>
> III. Whether Jackson's sentence is inappropriate in light of the nature of the offense and Jackson's character.

## Facts

Twenty-five-year old K.S.[1] is the daughter of W.S. ("Father") and Ki.S. ("Mother"). K.S. is "moderately, mentally handicapped." Tr. Vol. III p. 102. Mother and Father have legal guardianship over K.S., and they anticipate having guardianship over K.S. for the remainder of her life. According to Belinda Hubert, a clinical psychologist, testing revealed that K.S. is in "the moderately intellectually handicap functioning, which means about two percent of the population has lower scores than her." *Id.* at 101-02. K.S.'s "social

---

[1] K.S. was twenty-five years old at the time of the second trial in December 2018; the facts of this case begin in 2013, when K.S. would have been approximately twenty years old.

functioning" demonstrates that her "mental age" is "about 11 to 13 at the higher end," and K.S.'s "working memory reasoning" level, which relates to achievement in school, is "about the age of an eight-year-old." *Id.* at 103.

[4] K.S.'s disabilities are manifested in many ways, including: (1) Mother and Father remind K.S. each morning to complete routine hygiene tasks; (2) K.S. cannot read or write; (3) K.S. does not have a driver's license; (4) K.S. cannot recall her phone number to give it out to friends; (5) K.S.'s favorite television shows are cartoons; and (6) K.S. cannot play games on her own because she does not understand how to play. Moreover, Mother and Father only leave K.S. unsupervised for short intervals of time—no longer than two hours—and K.S. is only allowed to use the microwave after asking Mother and Father what buttons to press after an incident where K.S. almost burnt down the house by using the stove.

[5] Previously, K.S. attended Paladin, where she participated in art and computer classes, participant assistant care, community integration, and light assembly line work as prevocational work.[2] K.S. now attends Respite, which hosts group meetings and functions, approximately four times a week.[3] K.S. has participated in services, including: "job readiness skills," "[a]cademic base

---

[2] Participants at Paladin, who are considered below fifty percent productivity in the workforce, are given the opportunity to participate in work for pay.

[3] Respite "gives the parents relief from continued care giving," and "[participants] can do any type of activity in the community," in addition to having a "Respite home." Tr. Vol. II p. 184.

services," and "behavioral services." Tr. Vol. II p. 185. K.S. also has participated in Special Olympics.

[6] K.S. has friends, whom she occasionally visits or speaks to on the phone, and she has gone out on a date with one of her friends, "C.," twice. C. is a "little more high functioning" than K.S., and a group of friends went together to watch movies. *Id.* at 102. K.S. also went on a date with another man she met at Paladin; these dates, however, were always supervised, with the exception of one outing, which Mother and Father were uncertain was supervised. While K.S. was working at Opportunity Enterprises, a service much like Paladin, a man named "S." asked K.S. to marry him. S. did not attend subsequent dates arranged between K.S. and S., and nothing ever came of the couple's "engagement."

[7] K.S.'s knowledge of sexual intercourse and its potential consequences was extremely limited. K.S. "received the discussion about the birds and the bees" and about "birth control." *Id.* at 154. K.S. was permitted to attend "Thunder Down Under" with Mother and Mother's friends when she was twenty-one years old.[4] *Id.* at 156. Mother spoke to K.S. about sex and purchased a vibrator for K.S. because K.S. touched herself inappropriately in public and at home.

[8] In 2013, J.S., K.S.'s cousin ("Cousin") began hosting regular weekend cookouts approximately every other week. Attendees at these parties regularly included

---

[4] According to Mother, "Thunder Down Under" is a "male strip show." Tr. Vol. II p. 234.

Jackson, who was Cousin's neighbor, Father, Mother, and K.S. The parties were "mostly adult parties," and alcohol was served. *Id.* at 118. K.S. drank alcohol at these parties. K.S. also announced her previous engagement to S. at one of Cousin's parties. Father told a group at the party that the engagement was "not really that simple" because there was no ring, and Father was uncertain whether S. actually asked K.S. to marry him. *Id.* at 162.

[9] Jackson, a police officer, befriended Mother and Father at these parties, and, at one party, Father introduced Jackson to K.S. because K.S. "thought cops were really cool," and has "always idolized the police officers or fire fighters. . . ." *Id.* at 121, 127. Father told Jackson that K.S. is going to "act" and "look normal, but she is mentally retarded." *Id.* at 121-22. Similarly, Mother told Jackson that K.S. is "mentally retarded" and cannot "read or write or do any of the things that normal people her age would be doing." *Id.* at 248. Jackson also asked Father and Mother if K.S. was capable of having sexual intercourse; Father responded that it "would be possible," and Mother told Jackson that K.S. "is a woman" and "has all her parts," so she is physically capable of doing so. *Id.* at 124, 249.

[10] At one of the parties, Jackson asked Mother if he could take K.S. out for coffee or ice cream. While Mother and Father initially declined, they ultimately agreed as they believed Jackson was "trying to be a nice person." *Id.* at 125. Jackson told Mother that Jackson "wanted to make [K.S.] feel like she had a friend too." Tr. Vol. III p. 3. K.S. and Jackson went on outings—for coffee, ice cream, or a ride to the beach—two or three times a month, sometimes with

large gaps of time between the outings. Jackson texted Mother for permission to take K.S. out on each occasion.

[11] After one of their outings, Jackson notified Mother that he asked K.S., after she dropped food in her lap, if Jackson could "kiss Rachel," which is the word K.S. uses for her vagina. Tr. Vol. II p. 128. Jackson told Mother that K.S. responded, "no," and "giggled"; Mother and Father's impression was that Jackson was trying to make a joke. *Id.* at 131.

[12] On March 5, 2017, Officer Troy Webb, with the Westville Police Department, was patrolling the Prairie Meadow Park in Westville when Webb observed a van parked in the park. Officer Webb approached the van and did not see anyone in the front of the van; however, Officer Webb could hear movement in the back of the van. Officer Webb knocked on the window and asked the individuals to come to the front of the van. A few minutes later, Jackson appeared in the driver's seat. Shortly after, K.S. appeared in the passenger seat with her shirt only "three quarters" of the way on properly. *Id.* at 62. K.S. told Officer Webb that she and Jackson were "friends" and were "just hanging out and talkin[g]" in the van; Officer Webb instructed Jackson and K.S. that they should leave the park, which they did. *Id.* at 63.

[13] K.S. told Mother about the encounter, and Mother reported the incident to the police. Officer Brian Piergalski, with the LaPorte County Sheriff's Office, led the investigation and requested that K.S. receive a medical exam. Officer

Piergalski's investigation revealed that Jackson and K.S. had sexual intercourse on other occasions, including at a hotel and twice in a park in LaPorte County.

[14] Based on the investigation, the State charged Jackson with four counts of rape, Level 3 felonies, under Indiana Code Section 35-42-4-1, on April 24, 2017; amended charges were filed on September 18, 2017. Pursuant to the amended charging information, Counts I and II alleged that Jackson had sexual intercourse with K.S.; Count III alleged that Jackson "placed his penis in the mouth of K.S."; and Count IV alleged that Jackson "placed his penis into the anus of K.S." Appellant's App. Vol. II pp. 48-49.

[15] Jackson's first jury trial took place from March 27 through April 3, 2018, after which the jury found Jackson not guilty of Count I, but was unable to reach a verdict on Counts II, III, and IV; the trial court declared a mistrial on these counts. Jackson's second jury trial on Counts II, III, and IV, took place from December 17, through 21, 2018.[5]

[16] At the second trial, K.S. testified that sexual intercourse occurs when "two people get together." Tr. Vol. III p. 215. K.S. testified that the individuals' "private parts" touch, and when asked to elaborate what the "private parts" are, K.S. described them as the parts "where they use the bathroom." *Id.* at 217.

---

[5] At the second jury trial, the Counts were changed to Counts I, II, and III; however, for simplicity, we will continue with the original numbering of counts.

K.S. testified she knew what birth control was but did not know what a condom was.

[17] As to Jackson specifically, K.S. testified that Jackson always made plans with K.S. through Mother and that she did not call Jackson herself. K.S. testified that, when Jackson took her to the hotel, her interaction with Jackson "started getting weird" and felt "kind of awkward." *Id.* at 225. After they went in the hotel room, Jackson started "making [her] do weird things." *Id.* at 226. Jackson would then touch her "down there," where she "peed at," and would use "the same part of [Jackson's] body that he uses to pee" to touch K.S.'s "butt" and mouth. *Id.* at 228. After the incident at the hotel, Jackson told K.S. not to tell anyone because Jackson could lose his job. K.S.'s testimony revealed that "all of those things" that happened at the hotel happened at the park twice. *Id.* at 230. When asked if K.S. ever told Jackson she did not want to have sexual intercourse, K.S. testified: "I didn't want [to], he knew I had special needs so I couldn't agree to anything." *Id.* at 231.

[18] Jackson's testimony at the prior jury trial was played for the jury. The transcript of Jackson's testimony revealed Jackson's position that: (1) Mother told Jackson that K.S. was "special," which Mother further elaborated as K.S. having "a learning disability" and not "retarded"; (2) Jackson knew that K.S. "had a crush" on Jackson; (3) Mother once told Jackson that K.S. would "jump [his] bones" if they were left alone; (4) Mother was the one who started the outings by encouraging K.S. to ask Jackson for a ride in his car; (5) parents did not give Jackson any limitations on what should or should not occur when out

with K.S.; and (6) when Father discussed K.S.'s prior engagement, Jackson did not get the impression it was a joke, and instead, that Mother and Father seemed "sort of excited" about it. Conf. Ex. pp. 50-52, 75. Jackson also testified that K.S. drank alcohol at the parties and that he contacted Mother because K.S. told Jackson that her phone "was a pay-per-minute kind of thing," so Jackson should text Mother when he was on his way to get K.S. *Id.* at 60. Jackson did concede, however, that he "noticed [K.S.'s] speech was different," and that K.S. would snort and stutter when she got excited. *Id.* at 83.

[19] Jackson testified that, when he took K.S. to the hotel for the first time, he and K.S. did not have a discussion prior, but "given [K.S.'s] prior experience, [Jackson] assume[d] that she knew what was gonna happen." *Id.* at 62. Jackson elaborated that the "prior experience" was K.S.'s participation in "adult activities." *Id.* at 63. Once they were in the hotel, according to Jackson, K.S. "kissed [him] back" and "participat[ed] as much as [Jackson] was." *Id.* at 64. Moreover, Jackson explained, K.S. "didn't act confused," and when asked if she was okay, K.S. said, "yeah, . . . I'm fine." *Id.* at 65. Jackson testified that he asked K.S. several other times if K.S. wanted to stop which, according to Jackson, K.S. "never did." *Id.* at 68. Jackson admitted to having sexual intercourse, anal sex, and oral sex with K.S.

[20] At the end of the State's presentation of its evidence, Jackson moved for dismissal.[6] Jackson argued that the State failed to prove the incidents occurred in LaPorte County and that the State failed to prove Jackson had knowledge of K.S.'s inability to consent. The trial court denied the motion.

[21] Jackson then called three witnesses who often attended Cousin's parties in his defense. The witnesses testified as follows: Father never indicated that K.S. was "retarded"; K.S. was very social with everyone at the party; K.S. "fit in" with the group; K.S. "would do any thing (sic) to garter (sic) [Jackson's] attention"; and K.S. discussed her boyfriends and "having had sex with guys." Tr. Vol. IV pp. 23, 25, 31, 39.

[22] The jury found Jackson guilty of Counts II, III, and IV. At sentencing, the trial court found as mitigators Jackson's lack of criminal history and that Jackson is categorized as a low risk to reoffend. The trial court found as aggravators: (1) "the scope and magnitude of the criminal conduct over several years"; (2) Jackson's lack of character; (3) Jackson's violation of a position of trust; (4) Jackson's lack of remorse; and (5) the imposition of a reduced sentence would depreciate the seriousness of the crime. Appellant's App. Vol. III p. 27. The trial court sentenced Jackson to twelve years each on Counts II, III, and IV, to

---

[6] Jackson moved for "involuntary dismissal," which is governed by Indiana Trial Rule 41(B). Tr. Vol. III p. 245. This rule, however, applies "in an action tried by the court without a jury." Ind. Trial Rule 41(B). Indiana Trial Rule 50(A), which governs judgment on the evidence or a directed verdict, applies "in a case tried before a jury" and is applicable here. The trial court denied "Defendant's Motion for Directed Verdict." Tr. Vol. III p. 246.

run consecutively to one another, resulting in thirty-six years fully executed at the Department of Correction ("DOC").

## Analysis

### I.    *Sufficient Evidence*

[23] Jackson argues the evidence is insufficient to sustain his convictions for rape. When there is a challenge to the sufficiency of the evidence, "[w]e neither reweigh evidence nor judge witness credibility." *Gibson v. State,* 51 N.E.3d 204, 210 (Ind. 2016) (citing *Bieghler v. State,* 481 N.E.2d 78, 84 (Ind. 1985), *cert. denied*). Instead, "we 'consider only that evidence most favorable to the judgment together with all reasonable inferences drawn therefrom.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84). "We will affirm the judgment if it is supported by 'substantial evidence of probative value even if there is some conflict in that evidence.'" *Id.* (quoting *Bieghler,* 481 N.E.2d at 84)*; see also McCallister v. State,* 91 N.E.3d 554, 558 (Ind. 2018) (holding that, even though there was conflicting evidence, it was "beside the point" because that argument "misapprehend[s] our limited role as a reviewing court"). Further, "[w]e will affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Love v. State,* 73 N.E.3d 693, 696 (Ind. 2017) (citing *Drane v. State,* 867 N.E.2d 144, 146 (Ind. 2007)).

[24] Indiana Code Section 35-42-4-1(a)(3) requires the State to prove beyond a reasonable doubt that Jackson "knowingly or intentionally ha[d] sexual intercourse with [K.S.] or knowingly or intentionally cause[d K.S.] to perform

or submit to other sexual conduct" when K.S. "is so mentally disabled or deficient that consent to sexual intercourse or other sexual conduct . . . cannot be given." "Other sexual conduct," as defined in Indiana Code Section 35-31.5-2-221.5, as applies here, means an act involving: "(1) the sex organ of one (1) person and the mouth or anus of another person."

[25] Jackson does not dispute that he engaged in sexual intercourse and other sexual conduct with K.S. In fact, he admitted to having sexual intercourse, anal sex, and oral sex with K.S. Rather, Jackson argues that the evidence is insufficient to demonstrate that K.S. is so mentally disabled or deficient that consent could not be given or, alternatively, that Jackson was aware of such an incapacity.

[26] This Court has defined "mentally disabled or deficient" as having "subnormal intelligence or mental disease or defect." *Ball v. State*, 945 N.E.2d 252, 257 (Ind. Ct. App. 2011). The meaning of the phrase "has been expanded for purposes of those statutes to include not only a victim with lower-than-normal intelligence, but also a victim who was highly intoxicated, and a victim who had unknowingly ingested eight Xanax." *Id.* (internal citations omitted). The "mental disability or deficiency" prong of the statute "primarily exists to prevent abuse of persons in our society who, by reason of mental disability, are unable to protect themselves from sexual abuse." *Id.* The defendant "must be aware of a high probability that the victim is mentally disabled and unable to consent to sexual intercourse." *Bozarth v. State*, 520 N.E.2d 460, 464 (Ind. Ct. App. 1988).

Jackson contends that K.S. was able to make adult decisions—such as drink alcohol, get a tattoo, and engage with other adults—and was aware and possessed knowledge of sexual intercourse and its potential consequences. Jackson also argues that he was unaware of K.S.'s inability to consent because the evidence merely demonstrates that Jackson "was aware that K.S. was an (sic) learning-disabled adult woman who engaged in adult activities and had a history of dating other adult men." Appellant's Br. p. 21.

Jackson's argument is nothing more than a request for us to reweigh the evidence, which we cannot do. *See Gibson,* 51 N.E.3d at 210. The jury was presented with testimony that K.S. has the cognitive abilities of, at most, a thirteen-year-old. Moreover, the jury was presented with Jackson's testimony regarding his understanding of K.S.'s disability as well as the testimony of Mother and Father, who claim to have told Jackson the nature of K.S.'s disability, which demonstrated K.S.'s inability to consent. It was within the province of the jury to decide which witness to believe, and the jury had sufficient evidence to reach its guilty verdicts. *See, e.g., Bozarth*, 520 N.E.2d at 463-64 (holding that the evidence was sufficient to demonstrate the victim's mental disability and the defendant's knowledge of the mental disability where the twenty-one-year-old victim "was mildly retarded with a mental age of approximately 10 years old and an I.Q. of between 50 to 70," the victim's disability was "obvious," and the defendant made fun of the victim).

## II. *Abuse of Discretion in Sentencing*

[29] Jackson next argues that the trial court abused its discretion in sentencing by finding aggravators that are unsupported by the record and by failing to explain why the aggravating factors justified a consecutive sentence. Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.*

[30] A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* at 490-91. If a trial court abuses its discretion by improperly considering an aggravating circumstance, we need to remand for resentencing only "if we cannot say with confidence that the trial court would have imposed the same sentence had it properly considered reasons that enjoy support in the record." *Anglemyer*, 868 N.E.2d at 491.

## A. *Aggravating Factors*

Jackson contends that four of the five aggravators identified by the trial court are improper. First, we note that Jackson does not challenge the aggravator that he violated a position of trust in having the care, custody, and control of K.S. *See* Appellant's Br. p. 25 ("The trial court found five mitigating factors, and, as [Jackson] has argued above, four of them were improper or entitled to minimal weight."). The trial court remarked:

> Notwithstanding his position as a Michigan City Police Officer, as a human being the defendant had a duty to protect a person with obvious cognitive disabilities, who had been entrusted to his care, custody and control. In doing so, the defendant transgressed a boundary of sickening proportions. The Defendant's abuse of that trust is shocking to the conscience of the court.

Appellant's App. Vol. II p. 27.

The trial court also found "the scope and magnitude of the criminal conduct over several years" and Jackson's lack of character as aggravating factors. Tr. Vol. IV p. 152. In discussing these aggravators, the trial court noted that Jackson abused K.S. "over the course of several years" and that Jackson repeatedly lied to many people about his relationship with K.S. *Id.* Although Jackson challenges these aggravators, we view these aggravators as considerations of the nature and circumstances of the offense. Our Supreme Court has held that "the nature and circumstances of a crime is a proper

aggravating circumstance." *Gomillia v. State*, 13 N.E.3d 846, 853 (Ind. 2014). The trial court did not abuse its discretion by considering these aggravators.

[33] Next, the trial court found Jackson's lack of remorse as an aggravator. Jackson argues this aggravator is improper because he expressed remorse for his actions. "A trial court may consider as an aggravator the defendant's lack of remorse." *Sloan v. State*, 16 N.E.3d 1018, 1027 (Ind. Ct. App. 2014). A trial court's determination of a defendant's remorse is similar to a determination of credibility. *Holmes v. State*, 86 N.E.3d 394, 400 (Ind. Ct. App. 2017), *trans. denied*. Without evidence of some impermissible consideration by the trial court, we accept its determination as to remorse. *Id.* The credibility of Jackson's remorse was for the trial court to determine. The trial court found such remorse to be lacking, and we cannot say the trial court abused its discretion.

[34] Even if the remaining aggravator was erroneous, we do not need to remand for resentencing, as we are confident that the trial court likely would have imposed the same sentence here based on its obvious finding that these aggravators were significant. *See Bisard v. State,* 26 N.E.3d 1060, 1071 (Ind. Ct. App. 2015) (finding "violation of public trust" was an appropriate aggravator when the defendant was a police officer); *see also Collins v. State,* 643 N.E.2d 375, 382 (Ind. Ct. App. 1994) (holding "[t]he fact that [the defendant] had previously been a police officer was a valid consideration in determining aggravating circumstances"); *see also Edrington v. State,* 909 N.E.2d 1093, 1101 (Ind. Ct. App. 2009) (finding the position of trust aggravator appropriate for a child molesting

defendant when the defendant lived in the same neighborhood, knew the victim's father since they were young, and had friends in common with the victim's father). The trial court's sentencing statement supports the conclusion that, even with exclusion of one of the aggravating factors, Jackson would have received the same sentence. *See Anglemyer,* 868 N.E.2d at 491; *see also Gleason v. State,* 965 N.E.2d 702, 712 (Ind. Ct. App. 2012) ("One valid aggravator alone is enough to enhance a sentence or to impose it consecutive to another.").

### B. Consecutive Sentences

[35] Jackson next argues that the trial court abused its discretion because it failed to explain why a consecutive sentence was warranted and because the aggravators and mitigators are in equipoise. The trial court's order on the imposition of consecutive sentences states:

> The Court further finds that the sentences of imprisonment shall be served consecutively to each other as each criminal act was independent of the other and cannot be reasonably considered as a single episode of criminal conduct.

Appellant's App. Vol. III pp. 28-29.

[36] First, we decline to use our authority to change Jackson's sentences from consecutive to concurrent. As a panel of our Court held in *Lewis v. State,* 31 N.E.3d 539, 543 (Ind. Ct. App. 2015):

> While a single aggravator may be used both to enhance a sentence and impose consecutive sentences, . . . the trial court's brief sentencing statement here lacks specificity. But we need not

remand for sentencing because the rationale for consecutive sentences is apparent on the face of the record.

*Id.* Here, we agree with Jackson that the trial court's statement regarding the imposition of consecutive sentences lacked specificity. The trial court's reasons, however, can be gathered from its conclusion that the aggravators far outweigh the mitigators and its statement regarding Jackson's independent crimes. Four of the trial court's aggravators were proper, and "[a] single aggravating circumstance may be sufficient to support the imposition of consecutive sentences." *Gross v. State,* 22 N.E.3d 863, 870 (Ind. Ct. App. 2014). Accordingly, the trial court did not abuse its discretion in imposing consecutive sentences.

[37] Next, Jackson cites *Hoeppner v. State,* 918 N.E.2d 695 (Ind. Ct. App. 2009), to support his argument that the aggravators and mitigators are in equipoise, which we regard as a challenge to the weight afforded to the mitigating and aggravating factors. This argument is unavailing. *See Anglemyer,* 868 N.E.2d at 491 (holding "[b]ecause the trial court no longer has any obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, unlike the pre-*Blakely* statutory regime, a trial court can not now be said to have abused its discretion in failing to properly weigh such factors") (internal quotations omitted).

[38] Moreover, *Hoeppner* is distinguishable because, unlike the circumstances here, where the trial court found the aggravators far outweigh the mitigators, in

*Hoeppner,* the trial court "found the aggravator and mitigator to be in balance."[7] *Hoeppner,* 918 N.E.2d at 699. Here, the trial court's sentencing statement clearly indicates that, even with one possibly improper aggravator, the trial court did not consider the aggravators and mitigators to be in equipoise. The trial court's limitation, at that point, was to enter a sentence authorized by statute. *See Richardson v. State,* 906 N.E.2d 241, 243 (Ind. Ct. App. 2009) ("[O]nce the trial court has entered a sentencing statement, . . . it may then impose any sentence that is . . . authorized by statute; and . . . permissible under the Constitution of the State of Indiana." (quotations and citations omitted)). Based on the foregoing, the trial court did not abuse its discretion in sentencing Jackson.

### III.  *Inappropriate Sentence*

[39]  Finally, we address whether Jackson's sentence is inappropriate. Jackson asks that we review and revise his sentence pursuant to Indiana Appellate Rule 7(B), which provides that we may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her

---

[7] Still, on review, our Court found that, "In effect, the trial court found the nature and circumstances of the crime . . . as an aggravator supporting consecutive sentences." *Hoppner,* 918 N.E.2d at 699. Accordingly, our Court found the two aggravators and one mitigator were no longer in equipoise, warranting consecutive sentences.

sentence is inappropriate. *Wilson v. State*, 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied.*

[40] In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference." *Sanders v. State*, 71 N.E.3d 839, 844 (Ind. Ct. App. 2017) (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. Ct. App. 2008)), *trans. denied.* In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "if another sentence might be more appropriate; rather, the question is whether the sentence imposed is inappropriate." *Sanders*, 71 N.E.3d at 844 (citing *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)).

[41] We look to the statutory range established for the classification of the offense. The jury found Jackson guilty of three Level 3 felonies. The sentence for a Level 3 felony ranges from three years to sixteen years, with an advisory sentence of nine years. Ind. Code § 35-50-2-5(b). Here, the trial court imposed twelve years on each count, to be served consecutively, for an aggregate sentence of thirty-six years.

[42] First, we consider the nature of Jackson's offenses. In our consideration, Jackson urges us to review *Eckelbarger v. State,* 51 N.E.3d 169 (Ind. 2016), and *Walker v. State,* 747 N.E.2d 536 (Ind. 2001), to find that Jackson's three offenses were "similar" and, accordingly, to revise his sentences to run concurrently instead of consecutively. Appellant's Br. p. 28. In *Eckelbarger,* our Supreme Court held:

We have previously observed that consecutive sentences are not appropriate when the State sponsors a series of virtually identical offenses. Consistent with this precedent, the trial court in this case ordered the sentences on Counts I and II to be served concurrently. This same reasoning informs our deliberation and collective sentiment that, under the particular circumstances of this case, the sentences for Counts III and IV (dealing in methamphetamine by manufacture and possession of precursors)—convictions supported by evidence seized pursuant to a search warrant procured based on the dealing methamphetamine by delivery counts—should be served concurrently to the sentences on Counts I and II.

*Eckelbarger,* 51 N.E.3d at 170 (quotations and citations omitted). Similarly, in *Walker,* our Supreme Court held:

Walker was convicted on two counts of child molestation for performing oral sex on a six-year-old boy. Crimes against children are particularly contemptible. The trial court found a number of aggravating circumstances, including committing the crime while on probation and fleeing the jurisdiction. Still, the trial court did not find a history of criminal behavior. Moreover, the two separate counts of child molestation were identical and involved the same child. Additionally, there was no physical injury. Although the absence of physical injury does not bar an enhanced sentence, this is some distance from being the worst offense or the most culpable offender. While the aggravating circumstances warranted an enhanced sentence, Walker's aggregate sentence of eighty years is manifestly unreasonable.

*Id.* at 538 (quotations and citations omitted). Accordingly, in both cases, our Supreme Court found the sentences should be served concurrently instead of consecutively.

[43]     We do not believe such a revision is warranted here. First, *Eckelbarger* involves repeated controlled buys; not the type of offense before us. Second, as to *Walker,* even though Jackson's conduct involved the same victim, the evidence presented is that the nature of Jackson's offense was that Jackson raped K.S., a person incapable of consenting, in three different ways over a period of several years. Jackson asked K.S.'s parents for permission to spend time with K.S. under the guise of being her friend and regularly communicated with Mother to set up the meetings with K.S.—an action traditionally taken when a child is involved. Jackson also asked Mother and Father if K.S. had a disability and whether K.S. could have sexual intercourse. Jackson's conduct demonstrated his knowledge that K.S. was unable to consent; still, Jackson continued to pursue K.S. sexually.

[44]     Next, we examine Jackson's character. Fifty-three-year-old Jackson, who was married and a police officer at the time of his meetings with K.S., asked Mother and Father to spend time with K.S. under the pretense of being K.S.'s friend and wanting to support her. Moreover, Jackson knew K.S. admired police officers and manipulated that admiration to rape K.S. After taking K.S. on outings and spending time with K.S., Jackson took K.S. to a hotel and to a park and raped her. Jackson engaged in sex acts with K.S. multiple times over several years. Although Jackson has no prior criminal convictions, Jackson took on a position of trust, not just as a police officer but as a friend of K.S. and her family, and abused that position. Finally, Jackson persisted with K.S., despite knowing his actions were wrong, as demonstrated by his request that

she not share the encounters with others because he may lose his job. This does not reflect well on Jackson's character. Jackson's sentence is not inappropriate.

## Conclusion

[45] There was sufficient evidence to support Jackson's convictions. The trial court did not abuse its discretion in sentencing Jackson, and Jackson's sentence is not inappropriate. We affirm.

[46] Affirmed.

Altice, J., concurs.

Brown, J., concurs in part and dissents in part with opinion.

| | |
|---|---|
| Thomas K. Jackson, | December 31, 2019 |
| *Appellant-Defendant,* | Court of Appeals Case No. 19A-CR-796 |
| v. | Appeal from the LaPorte Superior Court |
| State of Indiana, | The Honorable Michael Bergerson, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 46D01-1704-F3-367 |

**Brown, Judge, concurring in part and dissenting in part.**

[47] I concur with the majority that the evidence is sufficient to sustain Jackson's convictions. I respectfully dissent from the majority's conclusion that Jackson's aggregate 36-year fully-executed sentence was not inappropriate in light of the nature of the offenses and his character. Jackson was convicted of three counts of rape of K.S. as level 3 felonies. At sentencing, the prosecutor recommended consecutive advisory sentences totaling 27 years and did not object to a "split sentence" with part of that time non-executed. Transcript Volume IV at 150. *See* Ind. Code § 35-50-2-5 (nine-year advisory sentence for a level 3 felony). The

trial court imposed three consecutive and fully-executed aggravated sentences of twelve years for a total sentence of thirty-six years. The presentence investigation report provides that Jackson's overall risk assessment score using the Indiana risk assessment tool places him in the low risk to reoffend category, and he scored in the low risk/needs category in each of the seven measured domains. In addition, a psychosexual assessment report provides that, using the Static-99 risk assessment as a measure, Jackson "scored a 1, which is considered to be in the low range of risk to be reconvicted for a sexual offense," and using the McGrath Cummings Sex Offender Progress Scale, Jackson "scored an 8, which is in the low risk range to re-offend." Appellant's Appendix Volume III at 21. The report recommended that Jackson "receive the benefit of split sentencing" with a period of incarceration and "a long period of probation so that he may benefit from a sex offender program." *Id*. at 22.

[48] Jackson was born in January 1966 and, prior to these offenses, he had been a police officer for twenty-eight years and had no criminal history. It is significant that Jackson had no history of criminal activity for many years, a factor that generally comments favorably on a defendant's character, especially when there is no such activity for a substantial time. *See* Ind. Code § 35-38-1-7.1(b)(6) (providing the court may consider, as a mitigating circumstance, that a "person has no history of delinquency or criminal activity, or the person has led a law-abiding life for a substantial period before commission of the crime"). "The statute appropriately encourages leniency toward defendants who have not previously been through the criminal justice system. Such mitigation is

especially appropriate for a defendant . . . who has lived a law-abiding life for decades." *Biehl v. State*, 738 N.E.2d 337, 339 (Ind. Ct. App. 2000) (noting Indiana Supreme Court opinions recognizing the significance of a lack of criminal history in sentencing), *trans. denied*.

[49] Additionally, Indiana's sentencing system is founded upon principles of reformation and not vindication, *see* Ind. Const. art. I § 18, and, as such, "where reasonably possible, sentencing orders should distinguish between first offenders and repeat offenders." *Bluck v. State*, 716 N.E.2d 507, 514 (Ind. Ct. App. 1999). A lengthy prison term for an offender who had no criminal record for decades and has been determined to be a low risk to reoffend does not reflect the goals of reformation or rehabilitation.[8]

[50] After due consideration, and in light of his lack of a prior criminal record for decades and the determination that he is a low risk to reoffend, I would revise Jackson's aggregate 36-year sentence pursuant to Ind. Appellate Rule 7(B). *See Walker v. State,* 747 N.E.2d 536, 538 (Ind. 2001) (revising two consecutive

---

[8] *See Does v. Snyder*, 834 F.3d 696, 704 (6th Cir. 2016) (noting the "significant doubt cast by recent empirical studies" on statements in *McKune v. Lile*, 536 U.S. 24 (2002), and *Smith v. Doe*, 538 U.S. 84 (2003), that the risk of recidivism posed by sex offenders is frightening and high); Ira M. Ellman & Tara Ellman, *"Frightening and High": The Supreme Court's Crucial Mistake About Sex Crime Statistics*, 30 CONST. COMMENT. 495, 503-504 (2015) (summarizing the results of various studies, some suggesting the risk of recidivism within five years for low-risk sex offenders is similar to that of non-sex offenders and that sex offenders who have not reoffended after fifteen years are not high-risk for doing so regardless of their offense or initial risk assessment, and others suggesting that sex offenders are less likely to commit a new felony of any kind after release than other released felons); Patrick A. Langan, Erica L. Schmitt, & Matthew R. Durose, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released From Prison in 1994*, at 1-2 (Nov. 2003), https://www.bjs.gov/content/pub/pdf/rsorp94.pdf (last visited December 9, 2019) (stating that, with respect to rearrests for any kind of crime, sex offenders were rearrested at a lower rate, 43 percent, than non-sex offenders, 68 percent).

enhanced sentences to concurrent sentences where the defendant did not have a history of criminal behavior, there was no physical injury, and the two separate counts of child molestation for performing oral sex were identical and involved the same child)[9]; *see also Harris v. State*, 897 N.E.2d 927, 930 (Ind. 2008) (revising two consecutive enhanced sentences to concurrent sentences where the two counts of child molestation were identical and involved the same child and citing *Walker*); *Monroe v. State*, 886 N.E.2d 578, 579-581 (Ind. 2008) (revising five consecutive sentences to concurrent sentences where the defendant molested the victim repeatedly over two years and his prior convictions were all driving-related offenses); *cf. Bass v. State*, 947 N.E.2d 456, 459 (Ind. Ct. App. 2011) (finding the defendant's sentence of concurrent terms of seven years with two years suspended for child molesting and attempted child molesting as class C felonies was not inappropriate where the defendant preyed on his girlfriend's younger sister and violated a position of trust in separate incidents and did not have an extensive criminal history), *trans. denied*.

---

[9] The majority finds that *Walker*, in which the Court noted the counts were identical, is distinguishable because Jackson committed his offenses in three different ways. I would not find that Jackson's offenses against K.S. were so dissimilar that *Walker* is distinguishable.